[Filed May 8, 1890.]

## D. W. BAILEY, APPELLANT, v. N. D. DAVIS, RESPONDENT.

MASTER AND SERVANT—AGISTER OF CATTLE.—When the relation of master and servant exists, the servant can acquire no lien on his master's cattle for depasturing or feeding them under section 3684, Hill's Code.

INSTRUCTIONS—ABSTRACT PROPOSITIONS OF LAW.—An instruction to the jury based on no evidence in the case is abstract and may be misleading.

APPEAL from Umatilla county: JAS. A. FEE, judge.

This is an action of replevin to recover about fifty head of cows. The complaint is in the usual form. The answer, after denying the material allegations of the complaint, alleges, in substance, that the defendant was entitled to the possession of the property described in the complaint and that he had a special property therein, under and by virtue of the following facts, to wit: That on or about the twenty-eighth day of November, 1888, at Umatilla, Oregon, the defendant, at the request of one Cripe, who was then and there the owner and in the lawful possession of said property, took said cows to care for, attend, feed and herd, and that defendant so cared for and bestowed labor and attention in feeding and herding said cows from the twenty-eighth day of November, 1888, until the ninth day of April, 1889, and that said care and

attention was reasonably worth $155.20, and that he has a lien on said property for said sum. The other facts appear in the opinion. The defendant had judgment. Plaintiff appeals.

*J. J. Balleray*, for Appellant.

No appearance for Respondent.

STRAHAN, J., delivered the opinion of the court.

As near as we can determine from this record, the defendant sought to retain the possession of the cattle in controversy under section 3684, Hill's Code, which gives to any person who shall depasture or feed any horses, cattle, hogs, sheep, or other live stock, or bestow any labor, care or attention on the same at the request of the owner or lawful possessor thereof, a lien for his just and reasonable charges and authorizes him to retain the possession of such property until such charges be paid.

On the trial the plaintiff gave evidence tending to prove that he was the owner of all of said property and was entitled to the immediate possession thereof, and that prior to the commencement of the action he had demanded the same from the defendant who had refused to deliver it. The plaintiff's evidence further tended to show that about the month of October, 1888, plaintiff leased the property in controversy to one A. J. Cripe, and that prior to the month of April, 1889, Cripe forfeited said lease by failing and neglecting to pay the rent mentioned in said lease for the use of said cattle, and that about April 1, 1889, Cripe "left between two days"; that the cattle in controversy were known as the John Ward and John Knight dairy cows.

The defendant testified as a witness in his own behalf, in substance: I know the band of cows mentioned in plaintiff's complaint; I was herding them about the first of last April; I know the cattle's brand; it was "O. K."; those branded "O. K." Cripe got of Bailey; two more, known as the "Wagenblast cows," came from town here; it was reasonably worth $35 per month to herd the cows; I herded them for about three months at the request of A.

J. Cripe; the herding amounted to $155; when the plaintiff demanded them of me on the sixth of April, 1889, I refused to surrender them and told him I held them for my labor of herding; I had possession of them at that time; I had the possession of them all the time and herded them on the Umatilla reservation and not on Cripe's ranch. On his cross-examination the defendant testified: The cows belonged to the "O. K." dairy on Wild Horse creek; I first went to work there in November, 1888, on the dairy ranch; there were some cows there then; some of the "O. K." cows; the John Knight cows were there; the cows were not all there; A. J. Cripe was running the ranch when I first went there; A J. Cripe was running the place when I first had anything to do with the cattle; on November 8, I believe, arrangements between myself and Cripe were made; I hired to work for him at the dairy for $30 per month and board; I continued to work till about the seventh of February on dairy work, then went to herding; Cripe agreed to pay me $35 per month for herding and board me; the arrangements for me to herd were made out at the ranch; I think Fred and Jack Bowman and Henry Dobson were present; he was to pay me by the month; I did not herd in a pasture; I herded on the reservation; I paid nothing for the privilege; I had plenty of grass of my own; I got it by driving on; I had as much right as any other herder; I owned no land and bought no privilege; Cripe told me to drive on the reservation; from February 7 I worked around the ranch evenings and mornings; Cripe was living there; I milked some of the cows; I drove them out in the morning and back at night and helped milk; sometimes four hands milked and sometimes three; they were Cripe's hands. * * * I swear that Cripe turned over those cattle to me for the purpose of being herded; he said he wanted me to take the cattle of him and herd them and bring them in and take them out; they were milked in the barn; driven in and tied in the barn; they slept there at nights—every night; it was in Cripe's barn; Cripe told me that I could hold the cows for my pay; that

he couldn't pay me till spring; I told him I would wait till spring.

John Knight testified that he was interested with Cripe in these cattle; that witness left the ranch in December; saw defendant there up to the time that Cripe run away; he first helped on the farm; helped milk after witness came away; hauled straw in December and January; was with Cripe when defendant first came to work; I paid $50 for the privilege of herding these cattle on the reservation from June 1, 1888, to June 1, 1889; he, Cripe, came in on the same privilege, and that is the way the cattle came to be herded on the reservation.

There were some other witnesses, but this is the material part of all the evidence.

The court gave this instruction, to which an exception was taken: "First—That if the jury find from the evidence that at the time of the demand of the plaintiff for the possession of the cows in question, and at the time of the commencement of this action the defendant was in possession of said cows, and that the defendant held said cows and herded and cared for the same prior to said time at the request of the owner or lawful possessor, and that the defendant took and held said cows for such purpose at the request of the owner or lawful possessor, then the defendant is entitled to the possession of said cows and may retain possession of the same until the just and reasonable charges of such care, attention and herding are paid."

1. This instruction follows the language of the statute very closely, and in a proper case no objections could be urged against it; but under the facts before the jury in this case it was purely abstract and was necessarily misleading. It assumed and the jury doubtless understood that there was some evidence before them upon which the instruction could be based, but there was none whatever. The defendant's relation to Cripe was that of a servant, and the relation of master and servant, and none other existed between Cripe and the defendant. The defendant had no

more lien for driving these cows out to the reservation for Cripe and back in the evening than he had for helping to milk them upon their return or for hauling straw, and he had no lien in either case. Nor while said relation of master and servant continued could he have any separate or independent possession of said property. Whatever service he performed or whatever authority he exercised was for Cripe and in its performance he represented him. The instruction given by the learned circuit judge was at variance with this view and was error.

It is true that the court followed the foregoing instruction by a number of others by which the jury was informed that no man working about the ranch and doing the usual work of a hired man about the ranch has any lien on the property of his employer and has no lien on his employer's cows, though part of his services should consist in herding them. And this: "No man employed for wages to herd cattle has any lien on the cattle for reasonable compensation." The court further told the jury: "If you find the defendant was a hired man working for wages, you must find for the plaintiff." And further: "Where the relation of master and servant exists no lien accrues." These instructions are correct statements of the law, but they do not purge the case of the error already committed by the court in giving the first instruction.

2. Here is an instruction given by the court which is erroneous for the same reasons that number one was an error: "It is for the jury to say whether or not there was an actual transfer of the possession of the property, and if you find from the evidence that these cattle were turned over to the defendant for the purpose of being herded, and defendant performed said service, and that he had the actual and exclusive possession, then he has a lien thereon, provided that the relation of master and servant did not exist and that an original and independent contract had been made for such herding; but if you find these cattle were not turned over, as above stated, then you must find for the plaintiff." All of this instruction down to the

proviso necessarily assumes that there was some evidence before the jury which would authorize the jury to find the facts therein recited.  I look in vain for such evidence but fail to find it, and it is for that very reason such instructions are always erroneous.  However correct they may be as abstract propositions of law and as applied to a proper case, they in effect tell the jury that there is evidence before them from which such facts may be found, and in that way such instructions may work serious injury to one party or the other.  A number of other exceptions were taken and appear in the transcript, but it is believed those already noticed sufficiently indicate the views of this court to answer all the purposes of another trial, should one be found necessary.

The judgment appealed from must therefore be reversed and the cause remanded to the court below for a new trial.