## COX v. BECK et al.

(Circuit Court, D. Oregon. September 4, 1897.)

1. CHATTEL MORTGAGE—KNOWLEDGE OF PRIOR DEFECTIVE MORTGAGES—ESTOPPEL.

One who takes a chattel mortgage on a flock of sheep with knowledge of prior mortgages on a portion of them, will be estopped from asserting the invalidity of such mortgages by reason of such uncertainty in the description that the particular sheep mortgaged cannot be identified thereby.

2. NEW MORTGAGE IN LIEU OF OLD—INTERVENING INCUMBRANCES.

Where the notes secured by two chattel mortgages were canceled, and a new mortgage taken on the same and additional property, to secure a new note given for the notes canceled and an unsecured debt, *held*, that there was not such a renewal of the former mortgages as would preserve the liens thereof against intervening incumbrances.

3. DEPOSIT OF PROCEEDS OF MORTGAGED PROPERTY—DUTY AND LIABILITY OF BANK.

A bank in which the owner of personal property has deposited the proceeds of the sale thereof is under no obligation to apply the money to the discharge of known liens held by others on such property, but may pay it out, in due course of business, on the checks of the owner.

4. MORTGAGE OF SHEEP AND INCREASE — PURCHASE OF INCREASE FROM MORTGAGOR.

Where sheep and their increase are mortgaged, the young lambs and fleece at the time the mortgagee takes possession for foreclosure are necessarily included in the mortgage, but the purchasers of such as have been previously separated and sold by the mortgagor in possession take without reference to the mortgage.

5. MORTGAGE ON SHEEP AND THEIR WOOL—EXPENSE OF MARKETING WOOL.

A mortgage lien on sheep and their wool is subject to the necessary expense of shearing, storing, and marketing the wool.

6. ILLEGAL INTEREST PAID TO NATIONAL BANK — REMEDY TO RECOVER PENALTY.

Where more than the legal rate of interest has been paid to a national bank, the remedy is a penal suit to recover twice the amount paid, and such payment is not available as a defense in an equitable proceeding to collect the debt on which it was paid.

This was a suit in equity by Richard T. Cox, as receiver of the First National Bank of Arlington, against George H. Beck and Joseph T. Beck, partners as Beck Bros., and the National Bank of Heppner, Or.

Wirt Minor, for complainant.

John J. Balleray and J. H. Raley, for defendants.

BELLINGER, District Judge. On the 24th day of July, 1894, the First National Bank of Arlington became insolvent, and was so adjudged by the comptroller of the treasury; and on the 2d day of August following the complainant was, by the order of the comptroller, appointed receiver of such bank. On November 20, 1894, the defendants Beck Bros. executed a chattel mortgage to the complainant, to secure certain promissory notes theretofore made by them to the Arlington Bank, upon 7,450 head of stock sheep, being all the sheep owned by them, "together with the increase therefrom to be born during the season of 1895." The amount secured by this mortgage is $8,903.17. Prior to this, and on August 11, 1894, Beck Bros. executed a chattel mortgage in favor of Frank McFarland, to secure three

several notes of that date for an aggregate amount of $2,513.55. The property mortgaged is described as follows:

"Our band of sheep branded B, consisting of about 2,300 head, there being about 1,800 from óne to five years old, and 500 lambs; all the wool on the above-described sheep; all increase of the above-described sheep."

On the same day—August 11, 1894—Beck Bros. executed a chattel mortgage in favor of the defendant the National Bank of Heppner, to secure two promissory notes of that date for the aggregate amount of $1,000. The property mortgaged is described as follows:

"All of our lambs of a certain band of sheep branded $\overline{\text{B}}$ consisting of about eleven hundred (1,100) head; all wool of above-described lambs, and all increase of above lambs; two hundred and fifty (250) head graded bucks running on our ranges; all wool of above-described bucks."

On November 14, 1894, Beck Bros., to secure their note for $1,500, executed to the National Bank of Heppner their chattel mortgage on 2,000 sheep, described as follows, to wit:

"2,000 stock sheep, consisting of ewes & lambs and wethers, branded, portion of them, B, and portion branded $\overline{\text{B}}$. Ear marks: Ewes, smooth crop off left ear & 2 slits in right ear; wethers, smooth crop off of right ear & 2 slits in left ear,—together with wool & increase during continuance of Mtg."

On June 27, 1895, Beck Bros. executed a chattel mortgage to the Heppner National Bank for $3,570.53. This mortgage was intended as a substitute for the last two above mortgages,—that of August 11th for $1,000, and that of November 14th for $1,500,—and was to secure the further sum of $850 and interest due from Beck Bros., for which the bank had no security. The property covered by this mortgage is described as follows:

"Three bands of sheep, consisting of about 6,000 head, all ages and sexes, together with the wool & increase. Ear marks: Ewes, smooth crop off of left and two splits in right ear; wethers marked smooth crop off right ear & two splits in left ear; branded on back each sheep with one of following brands: B, B, $\overline{\text{B}}$, J, X. Also all our hay in stacks and barns or growing on our lands in Grant Co., Ogn., consisting of about 500 tons."

On March 30, 1895, Beck Bros. entered into a contract in the nature of a chattel mortgage with H. C. Judd & Root, in the name of the Morrow County Land & Trust Company, for advances of money for clipping, packing, handling, transporting, storing, and selling on commission the wool clip of 1895. The advances provided for were $1,875 down and a further sum within four months from date, not exceeding $500. The property mortgaged by this instrument consisted of "all the fleece grown and now growing on 7,500 sheep marked $\overline{\text{B}}$. On October 17, 1895, a mortgage contract substantially like the above was made by Beck Bros. directly with H. C. Judd & Root for advances already made to the amount of $2,500, and for a future advance, within seven months, of an additional $1,000, for expenses for the wool clip of 1896. For these advances a lien is provided for upon "all the fleece grown and now growing on ten thousand sheep, consisting of all the sheep" then owned by the mortgagors. On March 7, 1896, Beck Bros. executed a chattel mortgage to the Heppner Bank for $1,000 on "all" of their sheep, consisting of about 10,000 head, etc. About July 1, 1895, Beck Bros.' wool clip was sold by the cashier of the Heppner Bank, under instructions from Beck Bros., for $4,768.26. The money

was paid to the cashier, and was by him deposited in the bank to the credit of Beck Bros., by whom it was paid out on checks as follows: To the Morrow County Land & Trust Company, $500.25; to H. C. Judd & Root, $2,195; to National Bank of Heppner, $1,164.52; to sundry parties, $908.49,—$4,768.26. There is in the hands of the receiver, being proceeds of sale of old sheep, the sum of $8,135, and the further sum, derived from the wool and increase of 1896, of $6,602.65.

The question is, how ought these several funds to be distributed between the parties? The complainant contends that the mortgage to McFarland and the three mortgages to the National Bank of Heppner are void for uncertainty in the description of the property mortgaged. But Mr. Cox, the complainant, admits that he was informed by one of the Beck Bros., at the time he took his mortgage, in November, 1894, that Beck Bros. had previously given mortgages as follows: To McFarland, on 2,300 head of sheep, as he believes, for $2,500; to the National Bank of Heppner, on 1,200 head, for $1,000; and to the same bank, on 2,000 head, for $1,500. He knew that these sheep were included in the number upon which his mortgage was taken. Having taken his mortgage with that knowledge, he is precluded in equity from objecting that the particular sheep cannot be identified. As to him, there is no necessity for such identification. His mortgage upon the whole necessarily included the portions of these chattels covered by the prior mortgages, and this is the only question of identity with which the complainant is concerned.

It is contended by complainant that the two mortgages to the Heppner Bank—that of August 11, 1894, for $1,000, and that of November 14, 1894, for $1,500—were discharged by the agreement of the parties of June 27, 1895, and by the execution of the new mortgage of that date. The new mortgage was intended as a substitute for the two existing mortgages, and to secure the additional sum of $850, for which there was no security. The two prior mortgages secure three notes; one for $328.46, one for $671.54, and one for $1,500. Upon the execution of the new mortgage, these three notes were marked "Paid" by the cashier of the bank, and given to Beck Bros. The mortgages were not formally canceled. Subsequently, these notes were returned to the Heppner Bank, and the bank now contends that, if the substituted mortgage of June 27, 1895, does not preserve the lien of the original mortgages, it is entitled to treat the original mortgages as subsisting liens on the chattels mortgaged therein. But a party cannot play fast and loose in this way. The cancellation and surrender of the three notes secured by the two prior mortgages, as between the parties, discharged such mortgages. The cancellation of a debt necessarily cancels the liens by which the debt is secured. If the new mortgage had been upon the same chattels described in the prior mortgages, I should be inclined to give to it the effect of continuing the liens of the canceled mortgages. But the property covered by these two mortgages cannot be identified as the same described in the third mortgage. While it is probable that some of the sheep and wool described in the two original mortgages are included in the substituted mortgage, yet there is no means of knowing how much of such property is covered by the last mortgage. The property

covered by the mortgage of August 11th is described as "our band of sheep branded B, consisting of about 2,300 head, and wool and increase; 1,800 being sheep from one to five years old, and 500 lambs." The mortgage of November 14th is upon 2,000 stock sheep, consisting of ewes, lambs, and wethers, branded, portion of them, B, and portion $\overline{B}$; together with wool and increase. The substituted mortgage is upon "three bands of sheep, consisting of about 6,000 head, of all ages and sexes, together with the wool and increase." In this and the preceding mortgage there is the same particular description of the earmarks of the sheep mortgaged. But, while the brand of the sheep in the mortgage of August 11th is B, and that of the sheep in the mortgage of November 14th is B and $\overline{B}$, the brands of the sheep in the last mortgage are B, $\underline{B}$, $\overline{B}$, J, and X. So that, while the number of sheep in the last mortgage is much larger than that in both of the original mortgages, it includes five brands, while the former only include two brands. If we assume that all the sheep in the last mortgage branded B and $\overline{B}$ are included in the two original mortgages, still the number of these sheep cannot be known nor guessed. Nor can it be known whether the sheep described in the mortgage of August 11th are included in those described in the mortgage of November 14th. If they are so included, and if all these are included in the substituted mortgage, the latter still covers nearly three times the number of sheep covered by the original mortgages. The proceeds of the sale of this large number of sheep cannot be applied upon a mortgage subsequent to complainant's, upon any theory of a lien under prior mortgages upon a little more than one-third such property.

It is claimed for the new mortgage that it was merely intended to renew the existing mortgages. But there was no necessity for such renewal. As to complainant, who was charged with notice, and as to all others, the new mortgage could only operate to create a lien, not to continue one. Notwithstanding the statements in the testimony of Bishop, cashier of the Heppner Bank, to the effect that he merely intended to renew the prior mortgages in taking the mortgage of June 27, 1895, I have no doubt that the new mortgage was intended to add to the security of the prior mortgages, as well as to secure a new debt. The acts of the parties at the time are more convincing than their testimony, after the event, as to their intentions in what was done. If it was practicable to identify, in the proceeds to be distributed, the property embraced in the two prior mortgages to the Heppner Bank, yet the conduct of its representative, in canceling the debt secured by these mortgages, in order that a new mortgage, including a large addition of property, and securing a new or unsecured debt, could be taken, should deprive the bank of the benefit of the liens by which the canceled notes were secured. The bank must abide by the election it has made to merge the old debt in a new one, with a new and larger security. The rule by which a party who cancels a mortgage, and takes in lieu thereof a new mortgage upon the same property, to secure the same debt, may have the lien of the first mortgage restored as against intervening incumbrancers, does not apply in a case where the old debt has been canceled, and merged, with other debts, into a new debt, secured by

a mortgage upon property of which at most only a part was included in the old mortgage.

The wool clip of the Beck sheep of 1895 was sold by Bishop, cashier of the Heppner Bank, for $4,768.26, and the money was deposited by the cashier in the bank to the credit of Beck Bros. This money was afterwards disbursed by Beck Bros. as follows: Paid to Morrow County Land & Trust Company, $500.25; paid to H. C. Judd & Root, $2,195; paid to Heppner National Bank, $1,164.52; paid to sundry persons on Beck Bros.' checks, $908.49,—total, $4,768.26. Complainant contends that this money in Bishop's hands was subject to the disposal of the bank, and should have been applied upon the debts of the bank against Beck Bros., and upon the debt of McFarland, of which the bank had notice. So far as the two mortgages held by the bank are concerned, this question is rendered immaterial upon the conclusion already reached, by which these mortgages are postponed to that of complainant. As to the McFarland mortgage, the duty did not devolve upon the bank to apply the proceeds of the wool clip in question in discharge of it. The bank did not own this mortgage at the time, and could not assume to pay it, nor otherwise look out for the rights of those having an interest in the fund. It might have applied this money upon a debt of its own due at the time, but it was not warranted in interfering, on its own motion, between Beck Bros. and their creditors, in matters in which it was not concerned. And so of the payment to Judd & Root, and of other payments made on the checks of Beck Bros. The receipt of this money by the Heppner Bank, and its payment upon the orders and checks of Beck Bros., was in the due course of business. So far as these payments are concerned, the Heppner Bank, having, in the view I have taken, no lien prior to complainant, was under no obligation to apply the money deposited in discharge of liens on the property sold. The obligation of a creditor having a first lien upon a fund towards other creditors interested in such fund does not exist in a case like this. The Bank of Heppner was not called upon to apply the money on deposit to the payment of complainant's mortgage, nor, as we have seen, to the mortgage of McFarland. Furthermore, the Judd & Root debt was secured by a specific lien upon the wool clip of 1895, and this clip was not within complainant's mortgage. Beck Bros. retained the title and right of possession of the mortgaged sheep. The increase of such property at the time the mortgagee takes possession for the purpose of foreclosure is necessarily covered by the mortgage, but this rule is limited to cases where it is impracticable or unnatural to separate the increase from the original stock. Lambs, as such, go with the ewes; but when they are grown they are not within the mortgage of the flock, unless they are made so by the express terms of the instrument. More especially is this so where they have been separated and sold. So, of the fleece, the mortgagee cannot be expected to shear the mortgaged sheep for another's benefit; but when the fleece is shorn, and sold by the mortgagor in possession, the purchaser takes without reference to the mortgage. The complainant, therefore, has no claim upon the proceeds of the wool clip of 1895. A part of the Judd & Root debt was for money paid

83 F.—18

upon the McFarland mortgage, and a part of it was for money used, in defraying the expense of shearing the sheep and in storing and marketing the wool clip. The payment to the Morrow County Land & Trust Company was for hauling the wool. Any lien upon the wool was subject to these necessary charges.

As to the wool and increase of 1896, the complainant's lien is prior to all others excepting that of the McFarland mortgage. Complainant had begun his suit of foreclosure, and the sheep were in the possession of the receiver, when the lambs for that year were born and the sheep were shorn. The rights of the mortgagee are determined, as to this question, with reference to the time when the mortgaged chattels are taken under foreclosure proceedings. If at that time the lambs are not born, or, being so, it is necessary for their nurture to permit them to follow the ewes, they must be considered, like the unshorn fleece, as included in the mortgage, since a separation is not practicable.

The defendants contend that complainant has received upon his mortgage a higher rate of interest than that allowed by law, and that, under section 5198 of the Revised Statutes of the United States, the complainant has forfeited all right to interest on his debt. The statute in question provides as follows:

"And the knowingly taking, receiving, reserving, or charging a rate of interest greater than aforesaid shall be held and adjudged to be a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon; and in case a greater rate of interest has been paid, the person or persons paying the same, or their legal representatives, may recover back, in any action of debt, twice the amount of interest thus paid, from the association taking or receiving the same: provided, that such action is commenced within two years from the time the usurious transaction occurred."

This statute was construed, in Barnet v. Bank, 98 U. S. 555, to define two categories, with their consequences, as follows: (1) Where illegal interest has been knowingly stipulated for, but not paid, there only the sum lent without interest can be recovered. (2) Where such illegal interest has been paid, then twice the amount so paid can be recovered in a penal action of debt or suit in the nature of such action, brought by the persons paying the same, or their legal representatives. In this case it was held that the remedy given by the statute is a penal suit, and that the party aggrieved, or his legal representatives, must resort to that remedy; that he can have no redress in any other form of procedure. Under such a rule, the fact, if it is a fact, that the complainant received a higher rate of interest than that provided for by law, can only be available in the manner indicated. The penal character of the statute requires that the fact be clearly made out in a proceeding instituted for that purpose, where the party accused of violation of the statute can have a trial of that question by jury. In this proceeding such a defense is not available, and, if the law was otherwise, still the testimony in this case is inconclusive and unsatisfactory. It is attempted to be shown, as a matter of inference from certain checks or memorandums signed by Beck Bros., that unlawful interest was paid. Neither Beck Bros. themselves nor their legal representatives make

complaint, and Beck Bros. are not witnesses to any fact tending to establish such a charge.

It follows that the fund to be distributed should be applied, after payment of costs and expenses of suit, as follows:    (1) To pay the McFarland mortgage of August 11, 1894;  (2) to pay complainant's mortgage;  (3) to pay mortgage of Bank of Heppner of June 27, 1895.