Hurlbut, J.,
rendered the opinion of the court.
On Rehearing:
This action was begun November 4, 1909, by defendant in error (plaintiff below). The complaint contains three causes of action: First, replevin to recover possession of three hundred and ten head of lambs included -within a mortgage upon eleven hundred and three of such animals; second, to recover $1400 for value of wool clipped from the sheep during the life of the mortgage, and before breach of the covenants thereof; third, to recover $1400 for injury and damage done to the lambs by such clipping.
The answer admits the mortgage, possession by defendant Sorrells of the lambs, and his refusal to surrender the same upon demand of plaintiff; but defends the action under a claim that he had an agistor’s lien, in the sum of $950, uppn the lambs replevined, superior to the lien of the mortgage. The answer also alleges that defendant received into his custody, from the owner Davis, something over two thousand sheep, to be taken care of and fed by him under the terms .of a contract dated October 28, 1908, entered into between himself and Davis; that defendant foreclosed the agistor’s lien and realized from the sale of the lambs the sum of $600, which he applied upon said indebtedness of $950, leaving a balance still due him of $360; that said plaintiff company, before execution and delivery of the mortgage, had full knowledge of all the circumstances surrounding the delivery of the sheep to him, and the care and feeding of the same. The answer further alleges as a defense that the plaintiff company took from defendant’s possession all of the two thousand sheep aforesaid, except the three hundred and ten lambs replevined, and sold the *156 same for more than enough to pay the entire mortgage indebtedness from Davis; but that instead of applying it to the liquidation of such indebtedness, it applied a large portion of such-proceeds first to the liquidation of an open account of $3200 or $3400 existing at the time from Davis’ to the mortgagee company, which left an insufficient amount from the sum received upon sale of the sheep to pay the mortgage indebtedness. The answer also admits that Davis clipped the wool and sold it to defendant, as charged in the complaint; but claims he purchased the same from said Davis for the agreed price of $1390, and applied that amount upon an indebtedness of $2000 then existing from Davis to himself.
The case was tried to the court without a jury, and the court rendered judgment in favor of plaintiff for the possession of the Iambs, or for their value, $1071, in case of non-delivery; also for $1103 damages for conversion of the wool.
This case has been ably prosecuted and defended by the attorneys for the respective parties, and we have given it careful consideration. There is but little controversy as to the facts. It appears to.be conceded by counsel for both parties that the disposition of three sharply defined issues is sufficient to determine this appeal:
First. Under our statute, does a chattel mortgage upon sheep, including in terms their “increase,” include the wool clipped therefrom in proper season, within the life of the mortgage, and before default, when no mention is made therein of such wool ?
Second. Did the relations between Davis and Sorrells warrant an agistor’s lien' in favor of the latter, under our statute ?
Third. If Sorrells was entitled to an agistor’s liep, did he waive such lien by his subsequent statements and acts, made and done at or about the time he solicited Mr. Campion, manager for defendant company, to guarantee *157 the future costs and expenses of feeding the lambs, then in his (Sorrells’) possession?
We will discuss the issues in the order named and refer to facts which appear to be established by the evidence as we proceed.
First, did the chattel mortgage include the wool thereafter clipped? At common law all'personal property subject to absolute sale could be mortgaged, and it is a general rule of law that a chattel mortgage fastens a lien only upon the specific property therein described. The statutes of California and some other states (not including Colorado) render a chattel mortgage void as to personal property other than that specifically designated by the statute. Section 515, Revised Statutes 1908 of Colorado, provides, among other things, that
“Every mortgage of live stock may cover and bind the increase of such live stock, or any part thereof, thereafter to be born, as may be provided therein,” etc.
The chattel mortgage in the case at'bar was given upon the following described property: ■
“All the following described live stock, cattle, and increase thereof and personal property, viz.: * * * Eleven, hundred three (1103) head of good Idaho lambs, average weight about 72 pounds, being the identical sheep purchased from B. F. Saunders at Cheyenne, Wyo., Feb. 20, 1909. ❖ Sji ❖
Said sheep are at present located in feed lots situated on the Teller’s and Sorrells’ ranch, located about three miles east of the town of Windsor, Weld County, Colorado,” etc.
A construction of the word “increase” found in the mortgage seems necessary. It has been repeatedly construed by text-writers and appellate courts in various jurisdictions, and the almost unanimous conclusion reached is that the term “increase,” when used in chattel mortgages upon sheep and other live stock, refers exclusively to the progeny or young of such animals, and does not include *158 wool grown on sheep, milk taken from cows, etc., during the life of the mortgage and before foreclosure, or before breach of the mortgage covenants, and particularly so when the possession remains in the mortgagor under the terms thereof. We find no text-writer, and but one case, holding to the contrary, viz.: Alferitz v. Ingalls, 83 Fed., 964 (decided December, 1897), in which an oral opinion was delivered by the trial judge. He held that the term “increase,” in a chattel mortgage of sheep, included the wool grown on the sheep within the life of the mortgage and before default. That case involved the construction of a chattel mortgage executed in California. It appears to stand alone, and is in direct conflict with the modern decisions of that state. The mortgage there contained the clause “eight thousand sheep and the increase thereof.” A few excerpts from the cases next hereinafter mentioned will be sufficient to show that other courts are not in harmony with this Federal decision in its construction of the word “increase.”
The case of Alferitz v. Borgwardt, 126 Cal., 201, 58 Pac., 460 (decided September, 1899), judicially interprets and defines the meaning and effect of the term “increase” when used in mortgages of live stock. The mortgage there expressly mentioned a drove of sheep and their increase. That case directly involved the right of a mortgagor to clip and sell the wool grown on the sheep after execution of the mortgage and before foreclosure. The mortgagee sued to recover the value of such wool. The court- said, in part:
“Section 2955 of the Civil Code, so far as material here, reads as follows: ‘Mortgages may be made upon the following personal property, and none other: * * * 16. Neat cattle, horses, mules, swine, sheep, goats, and the increase thereof.’
In addition to the fact that the presumption is against the right to mortgage personal property, and permission so to do must be clearly found in the statute, it- must be ad *159 mitted that the word ‘increase,’ although variously used, has acquired a special meaning when applied to domestic animals. So applied, unless expressly qualified in the context, it invariably means the young of such animals. Counsel has not found, and I venture to say cannot find, in legal literature or elsewhere (save, pqrhaps; in the mortgages of this class, and in Alferitz v. Ingalls (C. C.), 83 Fed. Rep., 964), an instance where the unqualified use of the word, as applied to such animals, included anything more or meant anything pther than the offspring, progeny or young of such animals. * * *
When we speak of the increase of a herd of cattle or a flock of sheep, we refer to growth of the herd or flock by addition of new members. * * * The wool does not increase the flock of sheep.”
In Stringfellow v. Sorrells, 82 Tex., 277, 18 S. W., 689, the court defined the meaning of the word increase, when applied to live stock, using, in part, the following language:
“As applied to live stock belonging to the wife, ‘the increase’ of such property has been invariably (ever since the decision of the Supreme Court in Howard v. York, 20 Tex., 670) recognized in the reported cases to denote the progeny of the original stock or their descendants. This construction comports with the etymology of the term, and accords with the universal understanding.”
To the same effect, Cox v. Beck et al. (C. C.), 83 Fed., 269, post.
The mortgage In the case at bar specifically mentioned the “increase,” but not the wool, and we are satisfied, from the authorities cited, as well as upon reason, that the word “increase,” as there used, did not extend the lien of the mortgage to the wool grown on the sheep subsequent to its execution, when clipped and sold by the, mortgagor while the sheep were in his possession, and before breach of any of the mortgage covenants.
*160 There are two lines of authority as to the effect of a chattel mortgage upon the title of the chattels mortgaged. Some states, including Colorado, hold the mortgage to be a conditional sale, passing title to the mortgagee, which becomes absolute upon breach of any of the mortgage covenants, while others hold that the mortgage is only a lien, the title remaining in the mortgagor until foreclosure or possession taken for that purpose. California and Montana belong to the latter class, and in its earlier cases Oregon followed the same rule, but now it appears to be in the former class.
In Shoobert et al. v. DeMotta, 112 Cal., 215, 44 Pac., 487, 53 Am. St., 207, decided March 31, 1896, the Supreme Court held that in chattel mortgages upon sheep, nothing being stated therein concerning the increase, the lien was not extended to the after-born young. The court said:
“In the absence of any express agreement upon the subject, the lien created by a mortgage is limited to the property which is described in the mortgage, and does not include other property of the same character which the mortgagor may have afterward acquired and placed with the mortgaged property. (Jones on Chattel Mortgages, Secs. 138, 154). If the mortgagor retains the possession of the mortgaged property, he is at liberty to deal with and use it as its owner, and whatever income or profit may be derived from such use belongs to him, and not to the mortgagee.”
While in that case the question of title to wool is not involved, the decision is pertinent, in that it recognizes the rule that in the absence of an express condition a lien created by a chattel mortgage is limited to the property therein described. The decision further appears to lay stress upon the fact that if the mortgagor of live stock by the terms of the mortgage retains possession of the same, he is at liberty to deal with and use it as its owner, and is entitled, *161 as against the mortgagee, to whatever profit or income may be derived from such use.
In the case of First National Bank of Santa Ana v. Erreca et al, 116 Cal., 81, 47 Pac., 926, 58 Am. St., 133 (decided February, 1897), the chattel mortgage on sheep did not refer to either increase or wool. Before default the mortgagors clipped fourteen thousand pounds of wool from the sheep and sold it, and also sold some eight hundred head of lambs that had been born subsequent to the giving of the mortgage. The court held that the lien of the mortgage did not extend to either the subsequently born •Iambs or the wool grown on the sheep and clipped after the execution of the mortgage and before foreclosure, the court saying, in part:
■ “The superior court erred in holding that the wool sheared from the sheep and their increase was covered by the mortgage and subject to its lien. * * *
The provision in Section 2955 of the Civil Code, authorizing the execution of a chattel mortgage upon ‘sheep, and the increase thereof,’ does not extend the lien of a mortgage upon ‘sheep’ to the ‘increase’ of the sheep, but implies that unless the increase is covered by the terms of the mortgage it is not included therein.”
The decision further held, on principle, as announced in Shoobert v. DeMotta, that the lien of the mortgage did not apply to lambs in gestation at its date.
Upon this point Alferitz v. Borgwardt also involved the right of a mortgagee to the wool grown on the sheep after execution' of the mortgage and before foreclosure. The mortgagee sued to recover the value of the wool clipped from the sheep, alleging in the complaint that defendant had converted it to his own- use. The court held that the lien of the mortgage was not extended to the wool, saying:
“It is assumed on both sides that the wool was not taken from the actual possession of the plaintiff. * * *
*162 It is also to be presumed that when the mortgagor retains possession of the sheep, he expects to make a profit from the sheep in the meanwhile. He certainly expects to make a living from such use and to pay his debt from it; as much so as one who mortgages his farm and retains possession. Upon the subject of use the intendments are the same. This idea is expressed in Shoobert v. DeMotta, supra, and it is said that where the increase are not mentioned, the mortgagee might as well claim the wool as the lambs, as each may be the annual profit which the mortgagor in possession is entitled to retain unless the contrary intent is-expressed. This reasoning equally applies to. the statute.”
In Demers v. Graham, Sheriff, et al., 36 Mont., 402, 93 Pac., 268, 14 L. R. A. (N. S.), 431, 122 Am. St., 384, 13 Ann. Cas., 97, the court held that a chattel mortgage upon cows did not extend the lien to calves in gestation at the time the mortgage was executed, where no reference was made therein to “increase.” The court said:
“The law is well settled in' this state that a chattel mortgage only creates a lien and does not pass title from the mortgagor to the mortgagee. * * *
Growing crops may be the subject of chattel mortgage, even though the owner of the same also owns the land upon which they are growing. And this rule prevails even in those jurisdictions where growing crops are part of the realty. * * * Now, it will not be contended that a grant of the land would not pass title to a growing crop. So, too, the sale of a cow would undoubtedly carry with it her unborn calf; but we cannot assent to the conclusion that because thereof, a chattel mortgage describing the cow only would also create a lien upon her offspring. * * * We think if the legislature had intended that the lien of a chattel mortgage describing particular animals should attach to their young thereafter to be born, it would have said so plainly, as it did in the case of a pledge. In the absence of such a declaration it seems reasonable to hold that because *163 the mortgage is simply a lien passing no title, the mortgagor in possession has the right to deal with the property as his own, and in the case of domestic animals may dispose of the young not mentioned in the mortgage as he sees fit. This construction leaves to the mortgagee the security described in the mortgage, and does away with the confusion that experience has taught invariably follows the adoption of any other rule. If, in cases like this, it be intended to include the offspring, the mortgage should so state.”
The court there quoted at great length from Shoobert v. DeMotta and First National Bank v. Erreca, supra, and adopted the conclusions and reasoning of the same. While the case does not involve the question of wool clipped from the sheep after execution of the mortgage, it clearly holds that if the mortgage fails to specifically refer to the after-born progeny of the mortgaged cows, even though in gestation, the mortgage lien is not extended to the same'. .
Notwithstanding these authorities, defendant in error contends with great force that the wool upon the sheep was a constituent part of the same, and that under the rule adopted in this state the title to the lambs passed to the mortgagee upon the execution of the mortgage, and therefore the title to the wool also passed; hence, the mortgagee was the lawful owner of the wool and was entitled to possession thereof, as against Sorrells, the purchaser — citing authorities that seem to sustain its position, of which the most direct and positive is Alferitz v. Ingalls, supra. We have already stated that the opinion in that case was an oral- one, and is in direct conflict with the Supreme Court of California, as well as those of Oregon and Montana.
In Knowles v. Herbert, 11 Ore., 240, 4 Pac., 126, the rule was announced as follows:
“That (mortgage) lien has not been foreclosed, and it is conceded in the argument for appellant to be the settled law in this state that a chattel mortgage, until it has been foreclosed, conveys no title or interest in the property *164 covered by it, except a mere lien to the mortgagee.”
However, a subsequent Oregon decision, Case Threshing Machine Company v. Campbell, 14 Ore., 460, 13 Pac., 324, repudiates the rule as there stated, the court saying, in part:
“It may be well said, as in the two cases referred to (Chapman v. State, 5 Ore., 432, and Knowles v. Herbert, supra), that a chattel mortgage simply creates, in the outset, a mere lien upon the property, and vests no title in the mortgagee; but that cannot be said after the conditions of the mortgage are broken. * * *
It will, I think, be observed in Chapman v. State, and Knowles v. Herbert, supra, that the broad declaration there made * * * was not necessary to the decision of the first of said cases, nor appears to have been to that of the second. * * * The Michigan courts come nearer to supporting it than any other of the state courts; but they only say that the title does not become absolute until foreclosure. * * * It is evident to my mind that the court went too far in those cases.”
So it would seem that Oregon subsequently changed its position, and in lieu of the doctrine laid down in Chapman v. State and Knowles v. Herbert, supra, adopted a rule analogous to the one prevailing in Colorado.
In Mayes v. Stephens, 38 Ore., 512, 63 Pac., 760, 64 Pac., 319, it is said:
“It- was formerly held in this state that a mortgage of chattels created only a lien upon the property affected thereby, * * * but it was subsequently determined that upon a breach of the condition of a chattel mortgage, the mortgagee thereby secured a qualified ownership in the property,” etc.
It is also said in Culver v. Randle, 45 Ore., 491, 78 Pac. 394:
“The rule is settled in this state that a chattel mortgage is a conditional sale of personal property, and after *165 breach of its terms a mortgagee has such a qualified right to the property as to enable him, under an allegation of absolute ownership, to maintain an action of claim and delivery for its possession.”
In logical sequence of the discussions it is well now to refer to another Federal case, Cox v. Beck et al. (C. C.), 83 Fed., 269, decided in September, 1897, three months before Alferitz v. Ingalls, The case involved the construction of a chattel mortgage executed in Oregon, and the conclusions of the district judge were diametrically opposed to those announced in Alferitz v. Ingalls. A number of chattel mortgages were executed upon sheep in that staté. In addition to determining the priority of such mortgages, the court held that under a mortgage given upon sheep and their increase, not mentioning wool, the mortgagee at time of taking possession for foreclosure, was entitled not only to the young lambs born after the mortgage was executed, but also to the wool then on the sheep; but that, prior to the time of taking such possession, a purchaser of 'wool grown on the sheep subsequent to the execution of the mortgage took title to the same free from the lien of the mortgage. The court said, in part:
“The increase of such property at the time the mortgagee takes possession for the purpose of foreclosure is necessarily covered by the mortgage, but this rule is limited to cases where it is impracticable or unnatural to separate the increase from the original stock. Lambs, as such, go with the ewes; but when they are grown they are not within the mortgage of the flock, unless they are made so by the express terms of the instrument. More especially is this so where they have been separated and sold. So, of the fleece, the mortgagee cannot be expected to shear the mortgaged sheep for another’s benefit; but when the fleece is shorn, and sold by the mortgagor in possession, the purchaser takes without reference to the mortgage. The com *166 plainant, therefore, has no claim upon the proceeds of the wool clip of 1895.”
From the California and Montana cases above cited it will be observed that although those states adhere to the lien rule, they, nevertheless, hold, under statutes similar to our own, authorizing chattel mortgages upon live stock and the “increase” thereof, that such a mortgage, wherein no mention is made of after-grown wool, does not extend the lien thereto, even though the mortgage specifically includes the “increase;” and, further, that under such a mortgage the mortgagor has a legal right to clip and appropriate to his own use the wool grown on the sheep prior to foreclosure, if by the terms of the mortgage he retains possession of the sheep. In the Oregon cases, however, as well as in Cox v. Beck et al., above cited, we have authority directly applicable to the situation existing in the case at bar. Those cases clearly show that Oregon adopted the same rule which obtains in Colorado, namely, that a chattel mortgage is a conditional sale, which passes title in the mortgaged chattels to the mortgagee upon execution and delivery of the mortgage, which title becomes absolute only upon breach of the mortgage covenants. From those cases it will be at once seen that under the conditional sale rule a chattel mortgage on sheep, specifically mentioning their “increase,” but making no reference to the wool growing on the sheep after execution of the mortgage, and before breach of conditions, does not extend the lien to such wool, if the mortgage provides that the possession of the sheep shall remain with the mortgagor; and if before such breach the mortgagor clips and sells the wool, during the life of the mortgage, the purchaser takes a good title thereto free from the lien of the mortgage. We have examined all the Colorado cases cited by counsel, and discover nothing therein against the Oregon rulings, but are inclined to think they, inferentially at least, are in harmony therewith.
*167 Before commenting on the Colorado cases it might be well to briefly allude to some pertinent facts established by the evidence which appear to be uncontroverted, viz.: The mortgage under consideration was executed February 25th and recorded March 2nd, 1909. Sorrells was part owner of the Teller and Sorrells ranch at the time of his contract with Davis, October 28, 1909, and was a farmer or ranch-man engaged in general stock business, the feeding and caring for sheep being a part of such business. Under the contract two thousand head of sheep were delivered by Davis to him.on said ranch, for feed and care, prior to the recording of the chattel mortgage.. Defendant in error (mortgagee) knew of such delivery, and that Sorrells had possession and was feeding and taking care of the sheep under arrangements with Davis, before it took and recorded the mortgage from him. The wool was-sold to Sorrells, by Davis (mortgagor) April 27, 1909, and clipped from the sheep about May 7th following. The note secured by the mortgage did not mature until May 25th of the same year. The sheep were in Sorrells’ possession and care from January 12th to August 7th, 1909.
The case of Atchison v. Graham, 14 Colo., 217, 23 Pac., 876, was an action in replevin to recover mortgaged personal property. By th'e terms of the mortgage the mortgagor retained possession. After maturity of the note the mortgagee’s assignee made an attempt to vest himself with possession of the property, which the court held to be futile. Thereafter it was seized under execution at the behest of a judgment creditor of the mortgagor. Breach of the mortgage covenants had been made, and the mortgagee failed to vest himself with such possession as the statute required, and for that reason alone the court held the levy good as against the mortgagee. The court said, in part:
“A chattel mortgage is in law a conditional sale of chattels, and operates to transfer the legal title to the mortgagee. Upon breach of the condition the title becomes abso *168 lute, and the mortgagee may then treat the mortgaged property as his own.” (Italics ours.)
The case of Hurt v. Hubbard, 41 Colo., 505, 92 Pac., 908, was an action in trover for conversion of mortgaged personal property. In this case also default in the payment of the mortgage debt had occurred. The court held that after such default the title became absolute in the mortgagee, who had the right to take possession of the property and sell the same under the terms of the mortgage. The court said, ip part:
“A mortgage of chattels is a conditional sale thereof, whereby the legal title is vested in the mortgagee subject to the right of the mortgagor to perform the conditions imposed by the mortgage. Upon violation of such conditions the title-of the mortgagee becomes absolute, and he is entitled to take and hold possession of the mortgaged chattels for the purpose of sale,” etc.
Here, again, it will be noticed that the debt secured by the mortgage had matured and the assignee of the mortgagee claimed the right of possession- of the property against the owner, for the purpose of foreclosure, which claim was upheld.
In Crocker v. Burns, 13 Colo. App., 54, 56 Pac., 199, a case of replevin by mortgagee after default, the court said, in part:
“On condition broken, the legal title to the chattels covered by a chattel mortgage becomes absolute in the mortgagee: * * * Especially is.this the case where, as in this' instance, the mortgagee had possession of the mortgaged property after foreclosure.”
From a plain reading of our statute, which authories mortgages upon live stock and their increase to be thereafter born, “as may be provided therein,” and from a careful perusal of the authorities cited, we have reached the conclusion:
*169 First. That the use of the term “increase” in the chattel mortgage in the case at bar did not extend the lien of the mortgage to the wool grown on the sheep after its execution and before breach of the mortgage covenants; that during that time the title to the wool remained vested in' the owner Davis, and that having clipped the wool from the sheep and sold the same to Sorrells, the latter took a good title thereto, as against the mortgagee.
Second. That while recognizing the law in this state to be that a chattel mortgage is a conditional sale of the property therein described, and passes a qualified title to the mortgagee, still if such mortgage be given upon sheep without express.mention therein of the wool thereafter to be grown thereon, the lien of the mortgage will not extend to such wool if the same is clipped from the sheep within the life of the mortgage and before breach of the mortgage covenants, provided the mortgage- by its terms permits the mortgagor to retain possession of such sheep until condition broken.
Third. It appearing from the record that under the terms of the mortgage Davis, mortgagor, retained possession of the sheep mortgaged, and while in such possession, before maturity of the mortgage indebtedness, and before breach of any of the mortgage covenants, clipped and sold the wool to Sorrells, the latter took good title to the same, notwithstanding the mortgage, and the trial court erred in ruling that the wool had been converted by Sorrells.
Having disposed of the first question, we will now take up the second. Did the relations between Davis and Sorrells warrant an agistor’s lien on behalf of the latter? The proven facts concerning this question, including some repetition, are as follows: Sorrells was part owner of the Teller and Sorrells ranch. At the time of the delivery of the sheep to him he was engaged in general farming, as well as in feeding and taking care of sheep for other people, upon said ranch, for a consideration. Under, the contract of Oc *170 tober 28th some twenty-one hundred sheep were delivered at the ranch by Davis and placed in the possession of Sorrells for the purpose of feeding and caring for the same, for a compensation, all prior to the recording of the mortgage in question, and the mortgagee (defendant in error), before the execution and recording of the mortgage, well knew of such facts. Sorrells retained possession of the sheep from January to August, 1909, and he first knew of the mortgage after it had been recorded. At all times during the life of the mortgage the sheep were in the exclusive possession, control and dominion of Sorrells. Davis was only at the ranch four times, not staying over an hour at any time. He gave no instructions to Sorrells concerning the sheep, and testified that Sorrells had charge of the feeding of the same, and directed the manner in which they were to be fed, and that there was nobody at the ranch representing him while the sheep were in Sorrells’ possession, aside from McCreery, who was there for the sole purpose of doctoring the sheep.
The contract referred to reads as follows:
“Windsor, Colo., October 28, 1908.
This agreement made and entered into by and between Charles Sorrells, party of the first part, and W. C. Davis, party of the second part,
WITNESSETH:—
Party of the first part agrees to sell to party of second part one hundred seventy acres of beet top pasture, on the Sorrells & Teller ranch, at $3.50 per acre; also agrees to sell to party of the second part all hay now on said Sorrells & Teller ranch not needed by himself for feed, at $6.00 per ton, on the basis of 512 cubic feet per ton.
Party of the first part acknowledges receipt of five hundred and ninety-five dollars, payment in full for pasture, and six hundred and five dollars, payment, on hay, balance due on hay to be paid at time hay is measured.
*171 Party of the second part agrees to feed 2000 head of sheep on said Sorrells & Teller ranch, and to pay to said party of the first part the sum of one hundred fifty dollars per month as full compensation for feeding and taking care of said sheep, including the hauling of all hay and grain required. Should party of second part conclude to feed pulp he agrees to pay to said party of first part a further sum of fifty dollars per month for hauling-an amount of four tons of pulp per day. Should party of second part conclude to pasture any cattle on said ranch he agrees to see that the do not damage or harm adjoining farmers or their property. It is understood, that the compensation of one hundred and fifty dollars per month commences with the der livery of the sheep on said ranch, and continues until sheep are taken away.
Party of first part agrees to have corrals and feeding pens in readiness to receive said sheep by the 15th of November.
(Signed) Charles Sorrells,
W. C. Davis.”
It is claimed by defendant in error that by the terms of this contract Sorrells was a mere hired servant of Davis, to care for and feed the sheep, and was thereby excluded from claiming the right of an agistor’s lien under our statute, which reads:
“Any ranchman, farmer * * * or any other person, * * * to whom any * * * sheep * * * shall be entrusted for the purpose Of feeding, herding, pasturing, keeping or ranching, shall have a lien upon such * * * sheep,” etc. Sec. 4013, Revised Statutes 1908.
If this contract must be construed in such a way as to deprive Sorrells of any rights possessed by him as a ranch-man under the statute; or, in other, words, if the contract transposed Sorrells’ status as a ranchman into that of a common hired servant, as defendant in error contends, there would be some force to their contention. We do not put *172 that construction upon the contract. It was probably drawn by laymen, and, as usual in such cases, lacks clearness and positiveness of expression concerning the subject-matter. There is apparent ambiguity in the contract, but not to such an extent in our judgment as to exclude Sorrells from his right to invoke the statute as a lien claimant under its provisions. Neither the intent nor purpose to deprive him of such right is manifested by any words used in the contract. It was disclosed at the trial, without objection, that, in addition to the express provisions of the contract, both Davis and Sorrells agreed that if there was not enough hay or feed on the ranch to properly feed the sheep intrusted to Sorrells’ care, the latter should purchase other feed from other ranches or places, for feeding, the market price thereof to be paid by Davis. This became necessary, and a large amount of corn, hay and similar produce was secured by Sorrells from other places, and fed to the sheep, all of which was approved by Davis, and his indebtedness therefor acknowledged by him. If all the evidence upon this branch of the case be considered in connection with the contract, it appears strongly to support Sorrells’ claim for an agistor’s lien. The evidence conclusively shows him to have been a farmer or ranchman by occupation and part owner in the ranch itself, having located thereon pens and other structures suitable for confining, watering, feeding and taking care of sheep. The sheep were in his sole and-exclusive possession, and he, only, had the right to decide on the manner and method of feeding, watering and caring for the same, in the absence of instructions in that behalf by Davis. It is not pretended that Davis at any time attempted to suggest or instruct how or in what manner Sorrells should care for and feed the sheep. Sorrells was responsible for their safety and proper care while in his possession, and if he had been derelict in his duty in that behalf he would have been answerable in damages to Davis. Our attention is directed to the following clause in the con *173 tract: “Party of the second part (Davis) agrees to feed 2000 head of sheep on the ranch.” We construe this as simply an expressed obligation on Davis’ part to deliver that amount of sheep on the ranch' into the possession of Sorrells, to be fed and eared for by him, as a ranchman engaged in that business. It is manifestly plain from the subsequent action of the parties that it was not intended by those words that Davis should, personally or through his representatives, go upon the ranch, take possession of the pens and lands adjacent thereto, and thus assume exclusive possession thereof as against the owner of the ranch. No such effort was made by Davis, nor did he indicate any desire to so do. We are not in accord with the contention of defendant in error that the mere clause in the contract providing for a fixed compensation to be paid to Sorrells for feeding and taking care of the sheep changed Sorrells’ status from that of a ranchman to that of an ordinary hired man. There is a well known canon of construction recognized in all jurisdictions, to the effect that where a contract is ambiguous, the construction placed upon it by the parties themselves is a good criterion to adopt in order to ascertain the intention of the parties from the language used. If that rule be adopted here, it appears from the testimony of both parties that neither Davis nor Sorrells considered the latter as a mere hired man, but rather as a sheep feeder and ranchman, having the sole custody and control of the sheep which were intrusted to his care for feeding, etc. On cross-examination of Davis he was asked:
“Q. You directed to him (Sorrells) how you wanted these sheep fed, did you not ? * * *
A. I ’ never gave him any directions, only took the sheep out there, but I understood that he was a sheep feeder, and a good one.”
In Tabor et al. v. Salisbury, 3 Colo. App., 335, 33 Pac., 190, the court sustained and approved an instruction as properly expounding the íaw, in these words, viz.:
*174 “The jury were properly instructed. They were clearly and plainly told by the court that if the stock was not entrusted to the ranchman to be fed, but remained in the custody of the owner or his employees, and the ranchman simply sold the feed which was consumed by the animals, and had no other custody, of them than that which flowed from the permission to use his yards for feeding purposes, the case was not within the lien statute as against the mortgagees. On the other hand, the court told them that if they found from the testimony that the stock was entrusted to the ranchman, and that it was in reality in his custody for the purpose of care during the winter, that then his lien would attach.”
The trial court in the instant case found and ruled that Sorrells was merely an employee of Davis under the contract, and as such had no right to an agistor’s lien under the statute. We have already shown that we are not in accord with that court in such findings and rulings.
We will now consider the third question raised, viz.: Did Sorrells waive his right to enforce his agistor’s lien?
Plaintiff contends that, as to the unpaid balance, if Sorrells had an agistor’s lien for a balance due (after crediting the amount received, from the sale of the wool) for feeding and caring for the lambs, he clearly waived the same as to the 306 head involved in this suit by permitting plaintiff to sell the same, after Sorrells had told Mr. Campion, on or about May 11th, that Davis owed him nothing for feed and care of the lambs in the past, and that he had settled with Davis for everything due at that time, those statements being made at the time Sorrells was soliciting Campion or his company to guarantee the payment’ of all future costs that might be incurred in the feeding and caring for the lambs. Defendant, on the other hand, insists that there was no agreement or understanding on Sorrells’ part to waive his lien, and Sorrells denies he ever so waived it. We have carefully perused the record, and conclude that *175 there is sufficient evidence in the record to support a finding either that the lien was waived or that it was not waived, but it is manifest that'the trial court did not decide this issue of waiver at the'trial. The court having ruled that Sorrells had no right to an agistor’s lien, it is evident that it-' did not consider the question of waiver of such lien. Upon retrial of the case this question of waiver may be submitted and determined.
Decided November 9, A. D. 1914.
Rehearing denied May 10, A. D. 1915.
Some other questions have been raised and discussed by counsel in the briefs, bút, as the views of the court above expressed dispose of this appeal, we do not deem it necessary to make further reference thereto.
The former opinion will be withdrawn, the judgment reversed, and the cause remanded for new trial.

Judgment reversed.