## WASHAKIE LIVESTOCK LOAN CO. v. MEIGH, ET AL.

(No. 1984; November 24, 1936; 62 Pac. (2d) 523)

For the plaintiff and appellant, there was a brief by *C. H. Harkins* and *D. J. Harkins* of Worland and *H. S. Harnsberger* of Lander, and oral arguments by *C. H. Harkins* and *H. S. Harnsberger.*

For the defendants and respondents, the cause was submitted on the brief of *Wm. B. Cobb* of Casper.

484

RINER, Justice.

Direct appeal proceedings bring this case here a second time to review a judgment of the district court of Fremont County rendered and entered therein on September 5, 1935. On the former appeal (No. 1840, Washakie Livestock Loan Company v. Bob Meigh, et al., 47 Wyo. 161, 33 Pac. (2d) 922) this court was compelled by law to reverse the judgment which had been theretofore rendered, because the judge who then tried the case was disqualified to sit on account of an affidavit of prejudice filed in due time as prescribed by Sections 89-1101, 89-1104 W. R. S. 1931.

For the sake of brevity the plaintiff and appellant will be usually hereinafter designated as the "plaintiff" or the "mortgagee," and the defendants and respondents, other than Bob Meigh and the Meigh Livestock Company, as the "lien claimants" or by their respective names.

A sufficient statement of the contents of practically all the pleadings of the parties to this litigation was set forth in the opinion which disposed of the former appeal, and it will be unnecessary at this time to repeat it. It may be added, however, that the separate answers of Bob Meigh and the Meigh Livestock Company to plaintiff's petition were in the nature of general denials, except that Meigh admitted that on November 27, 1931, he executed and delivered to plaintiff the chattel mortgage pleaded in plaintiff's petition and the Meigh Livestock Company admitted that it was then the owner of the property described in said mortgage. The answer of the plaintiff to the counterclaim of the lien claimants was a general denial and

an assertion that the lien of said mortgage was superior to the alleged liens in said counterclaim set forth. It will be observed that the real controversy in the case arose between the mortgagee and the several lien claimants.

When the case came on for retrial after the mandate issued on the previous appeal had been filed in the district court, the parties entered into a stipulation for the trial anew before another district judge, and "that upon such re-trial no additional testimony will be introduced by the parties, but that the cause will be submitted upon the transcript of testimony and exhibits offered and introduced at the previous trial of this action, leaving the sole question for decision by the court to be the liability, if any, existing in law in favor of cross-petitioning defendants against plaintiff by application of the law to the facts appearing and proven by said record and transcript of testimony herein." After argument heard upon the record thus submitted, the trial court entered judgment against the plaintiff, finding generally in favor of the lien claimants and decreeing that each of them recover from the plaintiff the stated amounts in said judgment recited. The record as now made up submits this action of the trial court before us for review.

The essential facts to be gathered from the evidence in the cause appear to be these: On November 27, 1931, Bob Meigh, being then the owner of certain cattle, sheep and other personal property, executed and delivered to the plaintiff a chattel mortgage thereon, which was shortly thereafter duly filed in both Natrona and Fremont Counties. This mortgage was given to secure the payment of Meigh's two promissory notes of even date therewith, one for $9,470 and the other for $1,360, payable to plaintiff, and also future advancements not to exceed the ultimate in all, $15,000. The instrument recited that it was also subject to a

prior mortgage of the same date to plaintiff securing two notes for $27,000 and $1,300 respectively and future advances up to $35,000. Parenthetically it may be remarked here that this mortgage was indorsed to the Federal Intermediate Credit Bank. Other than the incumbrances thus referred to the instrument stated that the property mortgaged was free from all incumbrances, that Meigh was at the time of the execution of the mortgage in the possession of and owner of said property, "that he has good and lawful right to sell and convey the same as aforesaid and that he will warrant and defend the same against the lawful claims and demands of all persons whomsoever."

It developed in the cross-examination of Mr. Healy, the president of the plaintiff, that this mortgage of November 27, 1931, was a renewal of other indebtedness extending back as far as the year 1927, said indebtedness consisting of advances made to Meigh by plaintiff from time to time, renewals being made yearly and all secured by mortgages. In order to obtain the loan involved as well as the renewal and extension of most of the debt which said mortgage secured, Meigh also on November 27, 1931, made a sworn property statement to the mortgagee, and on oath stated relative to the property covered by the mortgage that,

"For the purpose of securing the loan applied for above, I hereby submit this application and hereby represent and guarantee that the statements contained herein are true and correct, and that I have suppressed no information about the property offered as security which would adversely affect its value. I further represent that I am in open and peaceable possession of the property offered as security, that it is free from incumbrance, except as follows: As listed on statement—and that my title thereto is not questioned, nor do I know of any claim that might give rise to adverse claim of my possession."

This statement listed no incumbrances upon said personal property, except the two mortgages aforesaid and current taxes. It stated also that old store bills existed to the extent of $1,550 and wages in the amount of $1,200 were listed as accounts payable. Mr. Healy testified also that the sheep in question were of the value of between $12,000 and $13,000 at the time they were taken on the writ of replevin. This witness in his rebuttal testimony stated that his company advanced to Meigh from November 1, 1931, to November 1, 1932, in excess of $8,400 for running the sheep; that from November 1, 1930, to November 1, 1931, a larger sum than that was advanced to Meigh for the same purpose; and that he would say these amounts would be sufficient to meet the current yearly expenses of a sheep outfit such as Meigh had; that he, Healy, saw no difference in the manner of handling or controlling the sheep at the time he visited them and that no knowledge of a change in that respect was brought to his attention.

So far as the lien claimants are concerned, the present controversy concerns only the sheep included in the mortgage aforesaid. Only one of the lien claimants testified on the trial, Henry Gomez. The portions of his testimony which shed light upon the questions chiefly argued in the case are as follows: When asked in direct examination, "Where were you working prior to last November (November, 1932)?", he responded, "For Bob Meigh." The witness also stated that he had worked for Meigh since 1928; that in the spring of 1931, Meigh told him he did not have the money and could not pay his wages; that he could "stay out with the sheep until we get the money"; that Meigh said, "Stay with the sheep and take care of the sheep and be around with them"; that he (Gomez) knew the range and moved the sheep; that he went to Albert's store on the Big Horn Mountains and got supplies for

the sheep and the sheep wagons; that the other lien claimants worked on the Meigh ranch and herded the sheep, watered them and gave them salt. On cross-examination he testified that he worked for Meigh until the sheep were taken away in November (November, 1932); that he claimed Meigh owed him about three years' wages, $1992.82; that in 1932 his wages were $65.00 per month; that the stuff Gomez bought he charged to Meigh, and when he purchased clothes Meigh took them out of his wages when he settled with the witness; that he had no land of his own; that the sheep were run on government land, on Meigh's homesteads of which there were about twelve, and on school sections of state land, which were controlled by him; that Gomez was camp tender part of the time and part of the time herder; that he lived at Meigh's ranch and Meigh furnished the food; that Meigh told him to herd the lambs in October and November.

Albert, the storekeeper who owned the store from which the supplies for the sheep and the lien claimants were procured, gave testimony that they were all charged to Meigh; that he was looking to the Meigh outfit to pay the bill; that Meigh paid the 1931 bill for supplies; that he, Albert, on November 26, 1932, wrote to Healy,

"Mr. Rob't Meigh owes me $328.86 for groceries and merchandise for his herders advanced by me in the Big Horn Mountains this past summer. Payment was promised by Aug. 1st. this year, again when his Gov't loan was received. Lately I haven't heard from him at all in response to my letters.

"I would appreciate greatly an expression from you as to the probability of this account being paid this fall.";

that this bill was never paid.

The defendant Meigh, as a witness in his own behalf,

stated that the property in question was transferred from personal to corporate ownership in February, 1932, possession being not turned over to the Meigh Livestock Company until October of that year; that in the spring of 1931, not being able to pay the men who were working for him their wages as they fell due, he told them "to stay with the sheep, look after them and run them" and that he "would advise with them as to what should be done with the sheep and how we should handle them until such time as I was able to pay them"; that these lien claimants "knew the range as well as I knew it, and were capable of handling the sheep"; that "while we conferred as to how or what we should do at times, on the other hand, they practically handled the sheep"; that he and the men had frequent conversations on this subject, but he never "arbitrarily" directed what the men should do with the sheep. In response to counsel's extremely leading question, "In the course of those conversations, was this term or phrase ever used, Mr. Meigh, 'look to the sheep for your money'?", he said, "I don't know as it was exactly said in those words, but I implied the same thing very many times, maybe not in just those terms or words, though." This was followed by another leading question by counsel, "Was the phrase ever used in the course of your conversations about 'taking charge of the sheep'?", to which Meigh responded, "Yes, very often."; that certain stated amounts were due the lien claimants for "wages" as per witness' time book which showed the wages each man had coming; that he, Meigh, received advances from time to time from the plaintiff, and he used them to buy groceries—the balance remaining after he had paid for them he "divided up among the men as far as it would possibly go."

Meigh also testified that the sheep were sheared at his shearing pens on the ranch; that in the fall and

winter they were run on his ranch and in the vicinity thereof; that the herders of the sheep had no range of their own, but ran the sheep on Meigh's land and the open range; that his ranch was headquarters, from which the supplies for the sheep and men went out; that he bought the supplies for the outfit; that he, Meigh, in October, 1932, sold some of these sheep to another party; that he signed an agreement calling for the sale of 1300 feeder lambs in 1932; that in November, 1931, he contracted with one Carlson to feed 533 lambs and with one Gardner to feed 960 head of lambs. There is no evidence in the record that the lien claimants ever protested or objected in any way to Meigh's thus dealing with the sheep.

Other witnesses testified they saw the lien claimants looking after the sheep, but did not see Meigh with them. The latter's wife, as a witness for the defense, stated that the men had charge of the sheep, working them the way they saw fit.

The deputy sheriff, who took over the sheep on the writ of replevin, gave his testimony to the effect that when the sheep were thus taken from the lien claimants, they were asked for whom they were working, and they said, "For Bob Meigh."

It is urged that this evidence establishes a contract of bailment of the sheep in question entered into during the spring of 1931, between Meigh on the one hand and the lien claimants on the other. We are utterly unable to see that this is so. We think the only fair inference that can reasonably be drawn from this record is that these men who were working with the sheep were at all times merely employees of Meigh and the Meigh Livestock Company, and that the sheep were always after the spring of 1931, as they had been before that time, under the control and in the possession of Bob Meigh. In saying this we do not overlook the general finding of the trial court in favor of the

lien claimants. We are constrained to say that in view of the statements made by Meigh in the mortgage he signed and his sworn property statement quoted from above, no weight can be attached to his testimony that there was an oral contract of bailment entered into between him and the men who looked after the sheep. The testimony of Gomez, the only one of those who were the other alleged contracting parties to appear on the witness stand, falls far short of establishing such a contract. He unequivocally said that he was an employee of Bob Meigh, and his statement is borne out when the record is viewed in its entirety. In our judgment the general finding of the district court is not supported by the evidence in the case if such finding should be construed as determining that there was such a contract.

The question then remains for determination, under the provisions of the statute presently to be quoted, when the relation of master and servant subsists between parties and such servants are engaged in looking after and caring for the sheep of the master in the course of their employment, whether under such circumstances they have a lien upon the animals for the wages due them and which remain unpaid. This question we think must be answered in the negative. The weight of authority construing statutes resembling that of this state dealing with the matter so indicates.

The statute involved so far as material here reads:

"Any ranchman, farmer, agistor, or herder of cattle, * * * to whom any horses, mules, asses, cattle, sheep, goats, * * * shall be intrusted for the purpose of feeding, herding, pasturing, or ranching, shall have a lien upon said horses, mules, asses, cattle, sheep, goats, * * * for the amount that may be due for such feeding, herding, pasturing, or ranching, and shall be authorized to retain possession of such horses, mules, asses, cattle, sheep, swine, goats, * * * until the amount due for the feeding, herding, pasturing, or ranching

of said animals, is paid; provided, that the provisions of this section shall not be construed to apply to stolen animals." (Sec. 66-102, W. R. S. 1931.)

A number of the western states of the Union have or have had upon their statute books enactments quite similar either in language or general purport with the Wyoming law, as the following citations will demonstrate.

In National Bank of Republic v. Drulas, 61 Utah 440, 214 Pac. 24, the plaintiff claimed its title under a chattel mortgage given it by one Butterfield, and, as in the case at bar, brought an action in claim and delivery to obtain possession of a band of sheep. The principal defendants were sheepherders who asserted a lien upon the sheep for herding services rendered Butterfield as the owner thereof, in the sum of over $2000.00. They set up a counterclaim against the plaintiff for that amount. The law of the State of Utah (Comp. Laws of Utah 1917, Sec. 3771) provided that:

"Any ranchman, farmer, agister, or herder of cattle, tavern keeper, or livery stable keeper, to whom any horses, mules, cattle, sheep, or asses shall be intrusted for the purpose of feeding, herding, pasturing, or ranching, shall have a lien upon such animals for the amount that may be due him for such feeding, herding, pasturing, or ranching, and shall be authorized to retain possession of such animals until the said amount is paid."

The facts considered by the court were stated in the opinion briefly thus:

"Mr. Butterfield, who testified in detail concerning his relationship with defendants, said, with reference to defendant Drulas, 'I told him I would hold him responsible, and I put him in as a kind of foreman in charge of the sheep and held him responsible,' and, 'I left the thing entirely when I wasn't there up to Mr. Drulas and held him responsible for the handling of those sheep,' and 'after he had been with me longer,

and I was convinced he was capable of taking care of them, I naturally put them into his charge, and intrusted them to him more than I did when he started.'

"The relationship of the parties is not to be determined from the foregoing statements alone. Butterfield further testified that he hired Drulas to herd his sheep at a monthly salary, under his direction and subject to his orders; that he had the right to discharge him at will; that he ran the business, gave the orders, provided the range and feed, furnished the camp, directed the movements of the sheep and the men in charge, took sheep out and sold them, sold the wool, all without permission from Drulas, visited the sheep three or four times each season; and that he had the right to take the sheep away from Drulas at any time.

"The defendant Gialiotes was the camp tender, and occupied a much more subservient position. Indeed, his right to a lien cannot be seriously urged."

After carefully reviewing the decisions of other courts under analogous statutory provisions, the appellate court stated its conclusion thus:

"It is thus seen that there is very general agreement of judicial opinion to the effect that the lien created by the statute under consideration is dependent upon effective possession, and that a mere servant, by virtue of his relationship to his master, cannot have the quality of possession required and therefore can have no lien."

The law in Washington (Sec. 1705 Gen. Stat. of Wash.) declared that:

"Any farmer, ranchman, herder of cattle, tavern-keeper, livery and boarding stable keeper, to whom any horses, mules, cattle or sheep shall be entrusted for the purpose of feeding, herding, pasturing, training, caring for or ranching, shall have a lien upon said horses, mules, etc., for such feeding, herding, pasturing, etc., and shall be authorized to retain possession of such property until the amount is paid."

Where one employed by the month to herd a band of

sheep sought as against the owner thereof to foreclose a lien on the livestock for the amount due him as such herder, the trial court entered a decree in his favor upholding his contention that he was entitled under the law aforesaid to have such a lien. Reversing this decree on appeal, in Hooker v. McAllister, 12 Wash. 46, 40 Pac. 617, the court said:

"The main question, however, to be decided in this case is the construction of the statute above referred to. We are satisfied, both from an investigation of the statute itself and from the authorities which we have examined, that it was not the intention of the legislature to confer a lien upon persons who were merely hired by the month or day to herd sheep or cattle of any kind, where the possession remained in the owner and where the owner was responsible for such cattle; but that the statute intended to confer this lien upon agisters, upon those who took possession of the stock above referred to and who became responsible for them; and that the word 'herder,' used in the statute, has reference to that class of persons to whom is intrusted the possession and control of the property mentioned. The connection of the word 'herder' here with the other lienors provided for in the statute strengthens this idea. It would not be reasonable to conclude that the word 'farmer' used in the statute would have reference to a person who left his farm and went to work for wages in herding or feeding or keeping cattle; but it evidently means that where this character of stock is intrusted to a farmer who takes the same to his farm and keeps it there, he shall have the lien provided for in the statute. The same with 'ranchmen,' so mentioned. If any other construction were to be given to it, then it would not be necessary to designate them as 'farmers,' 'ranchmen,' 'herders of cattle,' 'tavern-keepers' or 'livery and boarding stable keepers'; but all that it would be necessary to have said, and that which the legislature naturally would have said, was that any person who shall be intrusted for the purpose of feeding, herding, pasturing, training, caring for or ranching, shall have a lien upon the property mentioned."

The Supreme Court of Oregon in Bailey v. Davis, 19 Or. 217, 23 Pac. 881, held erroneous under the facts involved an instruction given to the jury reading:

"That if the jury find from the evidence that at the time of the demand of the plaintiff for the possession of the cows in question, and at the time of the commencement of this action the defendant was in possession of said cows, and that the defendant held said cows and herded and cared for the same prior to said time at the request of the owner or lawful possessor, and that the defendant took and held said cows for such purpose at the request of the owner or lawful possessor, then the defendant is entitled to the possession of said cows and may retain possession of the same until the just and reasonable charges of such care, attention and herding are paid."

The court said:

"This instruction follows the language of the statute very closely, and in a proper case no objections could be urged against it; but under the facts before the jury in this case it was purely abstract and was necessarily misleading. It assumed and the jury doubtless understood that there was some evidence before them upon which the instruction could be based, but there was none whatever. The defendant's relation to Cripe was that of a servant, and the relation of master and servant, and none other existed between Cripe and the defendant. The defendant had no more lien for driving these cows out to the reservation for Cripe and back in the evening than he had for helping to milk them upon their return or for hauling straw, and he had no lien in either case. Nor while said relation of master and servant continued could he have any separate or independent possession of said property. Whatever service he performed or whatever authority he exercised was for Cripe and in its performance he represented him. The instruction given by the learned circuit judge was at variance with this view and was error."

In that case the law involved read (2 Hill's Code, Sec. 3684):

"Any person who shall depasture or feed any horses, cattle, hogs, sheep, or other live-stock, or bestow any labor, care, or attention upon the same at the request of the owner or lawful possessor thereof, shall have a lien upon such property for his just and reasonable charges for the labor, care, and attention he has bestowed, and the food he has furnished, and he may retain possession of such property until such charges be paid."

The action was one for the replevin of about fifty head of cows, brought by the owner against the defendant, who claimed a lien under the statute just quoted. It appeared that the owner of the cattle had leased them to one Cripe, who had employed the defendant. The defendant's testimony was to this effect:

"Cripe agreed to pay me $35 per month for herding and board me; the arrangements for me to herd were made out at the ranch; I think Fred and Jack Bowman and Henry Dobson were present; he was to pay me by the month; I did not herd in a pasture: I herded on the reservation: I paid nothing for the privilege; I had plenty of grass of my own: I got it by driving on; I had as much right as any other herder; I owned no land and bought no privilege; Cripe told me to drive on the reservation: from February 7 I worked around the ranch evenings and mornings; Cripe was living there; I milked some of the cows; I drove them out in the morning and back at night and helped milk; sometimes four hands milked and sometimes three; they were Cripe's hands. * * * I swear that Cripe turned over those cattle to me for the purpose of being herded; he said he wanted me to take the cattle of him and herd them and bring them in and take them out; they were milked in the barn; driven in and tied in the barn; they slept there at nights—every night; it was in Cripe's barn."

Subsequent to the rendition of the opinion just reviewed the Oregon Legislature enacted a law entitled "An Act Giving Herders a Lien upon Animals Herded." (Laws of Oregon 1893, page 97.) In Lydell v. First Bank of Joseph, 65 Or. 243, 132 Pac. 518, this statute

was considered and a different result was reached from that announced in the Bailey case, supra.

Under somewhat similar statutory language and analogous facts, in Love v. Hecer, 67 Mont. 497, 215 Pac. 1099, the court held that the statute was not intended to include wage-earners and employees of the owner and that thereunder a herder had no lien on sheep for wages due for services. The effect of the statute was indicated thus:

"The statute was intended to apply to those to whom the care, custody, control, and responsibility therefor, is by the owner or person in lawful possession intrusted. It was nòt intended to include mere wage-earners or employees of the owner, as their possession is that of the owner; their responsibility in caring for the herd is that of their employer. The statute is intended to give a lien to the ranchman, farmer, agister, herder, hotel keeper, livery, boarding, or feed stable keeper intrusted with the independent responsibility under contract to care for such animals. To entitle the class of persons mentioned to such a lien for the care of animals, they must be independent contractors, not as the servants or employees of a master. They must be bailees of the particular property."

Reaching similar conclusions are the cases of Underwood v. Birdsell, 6 Mont. 142, 9 Pac. 922; and Boston & K. C. Cattle Loan Co. v. Dickson, 11 Okla. 680, 69 Pac. 889

In McKee Live Stock Co. v. Menzel, 70 Colo. 308, 201 Pac. 52, the Colorado statute was so construed, the court using this language:

"Our statute (section 4568, M. A. S. Rev. Ed.) provides:

" 'Any ranchman, farmer, agister, herder of cattle * * * or any other person to whom any * * * cattle * * * shall be intrusted for the purpose of feeding, herding, pasturing, keeping or ranching, shall have a lien upon such * * * cattle * * * for the amount that shall be due for such feeding, herding, pasturing, keep-

ing, or ranching, and for all costs incurred in enforcing such lien.'

"This statute is in derogation of the common law, and must be strictly construed. Bailey v. O'Fallon, 30 Colo. 419, 420, 70 Pac. 755; Auld v. Travis, 5 Colo. App. 535, 539, 39 Pac. 357; Ellison, Adm'r. v. Tuckerman, Rec., 24 Colo. App. 322, 326, 134 Pac. 163. Possession is essential to support the lien, and that possession must be exclusive. Auld v. Travis, supra. No such lien exists in favor of one who is a mere hired servant of the owner. Sorrells v. Sigel-Campion Co., 27 Colo. App. 154, 171, 148 Pac. 279."

So in Mendilie v. Snell, 22 Idaho 663, 127 Pac. 550, where the law (Rev. Codes, Sec. 3446) prescribed that,

"Livery or boarding or feed stable proprietors, and persons pasturing live stock of any kind, have a lien, dependent on possession, for their compensation in caring for, boarding, feeding or pasturing such live stock,"

the statute was similarly construed. That was an action brought by the herder of a band of sheep, who had been employed by the owners of the animals at an agreed monthly wage and board to herd and care for the animals. He sought to recover damages from the mortgagee of the property, who had taken the sheep from his possession despite his claim of a lien thereon. The trial court gave judgment in his favor, but on review a reversal was had. The position in which the lien claimant stood in that case is thus described by the Supreme Court of Idaho:

"There is no substantial difference or conflict between the parties as to the nature of respondent's employment and the character of service he rendered. It appears quite clearly that he was employed in the ordinary capacity of herder, and that the sheep he was herding were grazed on the public domain, except during the winter seasons, when they were kept and fed on Snake River, and were herded and grazed about through the sage brush as well as could be done during the winter weather. The owners of the sheep exer-

cised the same right of control and possession as they had always done. They furnished all feed and supplies. They boarded the respondent. They assisted in moving camp, and apparently selected the ranges where the sheep should be grazed. It is true that Odiago, one of the owners, testified that respondent was to be responsible for the care and protection of the sheep, and for any that might be lost or destroyed by wild animals, and that he was to withhold the price of any such animals from the respondent's wages. During all this time the owners sold sheep and lambs from the band at any time they saw fit to do so to the aggregate of somewhere between 3,000 and 4,000 head. They sheared the sheep and sold the wool, and at the time the appellants took these animals from respondent they found him in charge of only about 1,100."

The conclusion of the court is given in this language:

"After a consideration of the statute and an examination of the authorities which have construed like statutes, we cannot avoid the conclusion that the possession meant and intended by our statute (section 3446) must be such as gives the party for the time the exclusive care, control, and direction of the property, and must be more than that of a mere servant for hire from day to day or month to month. The statute was evidently intended to apply to cases where a party takes the possession of personal property, as, in this case, live stock, and agrees to graze, feed, or pasture the stock for a time, and assume the exclusive care of and responsibility for the property, and furnish or procure the feed or pasturage. It might be on the public range or in his private inclosure."

The only case drawn to our attention wherein a construction placed upon statutory language like that embodied in the Wyoming law was different from that announced in the above cited authorities appears in Mead v. Bockorny, 49 N. D. 437, 191 N. W. 626, and it may be noted that the decision was rendered by a divided court.

17 R. C. L. 602 says:

"General statutes exist in numerous states which

create rights in the nature of common law liens, in that they authorize those who expend labor upon property to retain it as security, and deem the right lost when possession is parted with. Statutes of this character are said to be only declaratory of the common law, and must be interpreted in conformity with its principles. Accordingly, under such statutes, it is generally held that where the relation of the parties is shown to be that of master and servant, the latter is denied the right to claim its benefits, upon the ground that he does not have such possession of the property as is contemplated by the statute. And the same rule of construction has been applied to statutes giving a lien to persons who herd and care for animals, it being held that where the relation of the parties is established to be that of master and servant, no right to a lien for amount due for services is afforded by the statute."

1 Jones on Liens, Section 689, states the rule to be:

"When the relation of master and servant exists, the servant can acquire no lien on his master's cattle for depasturing or feeding them."

See also 3 C. J. 34.

If the legislature of this state shall in the future see fit to enact a statute which by apt language undertakes to give to a herder of sheep, who is a mere employee, a lien for his wages, it can undoubtedly do so. It has not, as we have seen, as yet indicated such an intention. Very likely the rights and interests of leasing owners and holders of other liens would in such a statute be duly guarded, the law being so phrased that secret oral agreements might not be made and used to deprive such persons of their property rights without their knowledge.

The judgment of the district court will be reversed with instructions to dismiss the lien claimants' counterclaim.

*Reversed and remanded with instructions.*

KIMBALL, Ch. J., and BLUME, J., concur.