### DINKELSPEEL v. LEWIS; INTERMOUNTAIN ASS'N. OF CREDIT MEN v. LEWIS, ET AL.

(Nos. 1961, 1962; Nov. 24, 1936; 62 Pac. (2d) 294)
(Rehearing denied February 23, 1937)

For the appellant there was a brief and oral argument by *P. W. Spaulding* of Evanston, Wyoming.

For the respondents, there was a brief and oral argument by *Louis Kabell, Jr.* of Evanston, Wyoming.

RINER, Justice.

These two cases, brought here by direct appeal from the district court of Uinta County, were consolidated for the purpose of trial, the evidence which was introduced before the court sitting without a jury being submitted to be considered so far as applicable in each case. Complete records have been brought to this court, except that one transcript of the evidence was filed in the district court and ordered to constitute and by reference to be adopted as such transcript in the record on appeal in both causes. By order made here, upon stipulation of the parties, the two cases have been briefed and argued together, and one opinion will suffice to dispose of both of them.

## I.

The litigation at bar designated as No. 1962 was commenced October 18, 1934, by the Intermountain Association of Credit Men, a corporation, as plaintiff, at present respondent and usually hereinafter referred to as the "plaintiff," against Hank M. Lewis and Joe Dinkelspeel, doing business under the firm name and style of "The Buffet," as defendants, Lewis being the appellant here and Dinkelspeel a respondent also. Thereby, the plaintiff as assignee of certain claims for merchandise, etc., alleged to have been sold, delivered and furnished to said defendants as partners, doing business under the firm name of "The Buffet," sought to recover from them the amounts claimed to be due thereon.

Plaintiff's position sets forth six causes of action, the first thereof being upon an alleged account for goods sold said defendants by Keeleys, Inc., a Utah corporation, in the sum of $11.16; the second upon a claim for $96.46, and the third upon a claim for $214.37, both of these being for goods sold by the Western Furniture Co., also a Utah corporation; the fourth upon a claim for $183.65 for electric signs, power, fuel and service, and the fifth upon a claim for $416.00 for two refrigerators, all having been sold and furnished by the Utah Power & Light Company, a Maine corporation; and the sixth cause of action upon an account for merchandise, in the sum of $98.67, sold by the Utah Wholesale Grocery Co.

The defendant Dinkelspeel interposed no defense to the action. His co-defendant, Lewis, however, filed a separate answer and counterclaim to plaintiff's pleading, in which he denied the existence of the alleged partnership between him and Dinkelspeel; denied that he ever requested to be sold him, or that there was ever delivered to him, the merchandise, etc. mentioned

in the first, second, fourth, fifth and sixth alleged causes of action; and denied that any amounts were due from him to the plaintiff thereon. Concerning the stated third cause of action, he denied the existence of the partnership as claimed and that the goods therein mentioned were sold or delivered to said defendants. He avers, however, that the Western Furniture Company sold to him, Lewis, the said merchandise, less certain enumerated items, totaling charges of $16.70; and he admits that $190.17 remained unpaid on the account. In this connection also the defendant Lewis set out a counterclaim for the asserted failure on the part of the Western Furniture Company to furnish the merchandise as agreed, offered to return the same, and claimed a credit of $342.00 thereon, and, in consequence, an overpayment of $151.83, for which he asked judgment.

Plaintiff filed a reply consisting for the most part of a general denial of the new matter set out in the counterclaim and answer of the defendant Lewis.

The district court in its judgment found that a partnership existed between Dinkelspeel and Lewis and ordered a recovery against them of the several amounts claimed by plaintiff, with interest, except as to the third cause of action, where a recovery of $25.10 only was allowed. Lewis and the plaintiff both saved exceptions, Lewis generally and plaintiff to that part of the judgment adverse to it relative to the third cause of action, but as already indicated, Lewis appears to be the only one who saw fit to prosecute appeal proceedings.

A motion to dismiss the appeal has been made for failure on appellant's part to attach a certificate of verity by counsel, as required by our Rule 37, to the abstract filed in the cause, and also on the ground that the brief filed in his behalf did not contain a statement

of the points relied on and failed as well to refer to the pages of the record where the questions discussed arose, as required by the rules of this court. We observe, however, that counsel for appellant has offered to remedy these defects. While we look with disfavor upon any failure to obey the requirements of our rules, still upon examination we find that in this case neither opposing counsel nor we have had any great difficulty in ascertaining the portions of the record or points involved and no serious question is raised concerning the actual accuracy of the abstract itself. If the points raised were many, the portions of the record where they might be found difficult of ascertainment or the abstract utterly inaccurate, we would be obliged to reach an affirmative conclusion relative to granting the motion. The motion to dismiss will therefore be denied.

The principal and controlling question in the case is whether the district court's finding that a partnership existed between Dinkelspeel and Lewis is sustained by reasonably substantial evidence introduced on the trial. If this question shall be resolved in the affirmative the judgment must be upheld.

Summarized the material facts in evidence to be considered in determining the matter are as follows: The defendant Lewis owned a one story brick building, with full basement, in Evanston, Wyoming, the title to which, in June, 1934, was held by his wife. It had theretofore been vacant for some two and one-half years, and Lewis was desirous of having the premises occupied. About the 1st of May, 1934, he went to Salt Lake City and discussed the matter with Dinkelspeel, who at the time was about to close out the business in which he was then engaged. Lewis at that time asked Dinkelspeel to consider coming to Evanston and go into business. The latter replied that he was not in financial condition to do so, as he had no finances at

all, but, as Dinkelspeel testifies, Lewis said, "maybe he could handle that." At Dinkelspeel's suggestion they both looked at a business place in Salt Lake City, and Dinkelspeel told Lewis that it was the kind of place he thought might make money and "go" in Evanston. Dinkelspeel thereafter came to Evanston to look over the building, and upon being asked by Lewis as to what it would take to equip the place, Dinkelspeel put the amount at $2500.00. Lewis then advised Dinkelspeel he could raise the necessary funds, and they subsequently met in Salt Lake City to look over fixtures and "talked," as Lewis himself testified, "about going in business." Before looking at the fixtures Dinkelspeel testifies that he and Lewis had a conversation as to how the business should be run, whereby it was agreed, "I was to have charge of the business, he did not want anybody to know he was interested in it, mentioned that to me several times"; that "he (Lewis) would fix it to run the business and buy the stuff and I was to have fifty per cent of the profits after all expenses were paid"; that these expenses "included running expenses, help, light, your current bills, any stock and everything it takes to run a business"; that nothing was said as to the length of time the business was to continue; that there was no written agreement; that Lewis said "we would make the rent agreeable" if Dinkelspeel came to Evanston, and suggested $75.00 per month; that Dinkelspeel never agreed to pay Mrs. Lewis any rent for the building, and never paid any rent.

The fixtures for the proposed business were purchased from the Western Furniture Company, whose president testified that he sold Lewis and Dinkelspeel furniture, booths, tables and chairs; that the ticket for the sale was made out to Lewis, who said he would do the paying for the articles; that all the buying was done by both Lewis and Dinkelspeel; that the goods

thus purchased were delivered the latter part of June, 1934, in Evanston, by truck; that Lewis did not pay the full amount due, then claiming that the articles were defective; that they were unable to agree on an amount necessary to put them in proper condition, and that the items making up the bill of goods sold by the Western Furniture Company for $96.46 were bought after July 24, 1934, and were charged to Dinkelspeel because Lewis told the vendor he did not want it "charged to him personally."

Dinkelspeel also testified that Lewis visited the place every day after the business was opened; that he had access to the safe, the books of the business, and on one occasion undertook to balance the accounts; that Lewis had a key to the front door of the place of business and to its stock room, Lewis admitting as a witness that at one time he gave out certain articles of stock to an employee of the business who needed them in the course of his work there; that the oral agreement was that Lewis "was to provide all the money to run the business until it could take care of itself"; that Lewis would be repaid this money he would advance "as the business showed a profit"; that there was no agreement that Dinkelspeel should individually pay this money back; that Lewis had advanced money for stock and running expenses needed in the business to the extent of $1102.85 by July 16, 1934; that on July 16th Lewis requested Dinkelspeel to give him a note for this amount, saying that he would take it to the bank to raise money on; that Dinkelspeel accordingly gave Lewis a note for this amount, less $2.85, which was given to the latter in cash from the cash register, the note being made payable to the latter and due October 16, 1934, and being signed "The Buffet, Joe Dinkelspeel"; that this note was given for no other purpose than for raising money in connection with the business; that Lewis, several days later and subse-

quent to the time the note had been given, told Dinkelspeel he could not negotiate it; that Dinkelspeel employed the help in the business, but consulted Lewis about the wages to be paid; that Dinkelspeel issued cards, meal tickets, invitations to the opening of the business and menus, obtained federal and town liquor licenses and insurance on the stock in trade in his own name, as proprietor, because Lewis, who furnished the money, directed him to do that inasmuch as Lewis did not want to be known as interested in the business; that Lewis negotiated for the insurance on the stock; that the insurance policy was brought already written to him, and he paid for it; that on September 14th, at his own suggestion, he signed a chattel mortgage on the stock owned by the firm, The Buffet, in favor of Lewis; that this was dated back to the date of the note aforesaid; that he, Dinkelspeel, gave the mortgage to avoid an attempt to attach anything belonging to the firm for his personal debts and to protect Lewis' interests; and that he received nothing from Lewis at the time it was given in return for signing the mortgage.

Willy, the manager of the Utah Power & Light Company, testified that the two refrigerators bought and used in the business were purchased by both Lewis and Dinkelspeel, but he was unable to say which one placed the order; that Lewis told him to charge these articles to Dinkelspeel; that he, Willy, was not told by Lewis that he was not in any way responsible for Dinkelspeel's bills; that he could not say that the bill for $183.65 for power, etc. he was told to charge to Dinkelspeel, but that it was made to the latter because he was occupying the building.

Lewis' testimony in a large measure conflicts with Dinkelspeel's. He denies that there was any oral agreement as testified to by Dinkelspeel. He states that Dinkelspeed was to pay rent on both the building and the fixtures; that there was no agreement to share

the profits of the business or which related to a partnership between them; that in fact he had no interest in the business at all; that he told Willy he had nothing to do with buying power for the business and that Dinkelspeel would pay for it and that the refrigerators were to be charged to the latter; that he never requested Dinkelspeel to sign a written lease of the premises, though he previously and thereafter, when the premises were leased to others, always rquired such an instrument; that the estimate he got to put the defective furniture purchased from the Western Furniture Company in proper shape was in the sum of $100.00; that three or four tables were warped, two or three chairs defective and all the booths were of rough lumber; that he purchased a toastmaster and electric fan for use in the business and paid for them to the Utah Power & Light Company himself; that he and Dinkelspeel both worked to get the place open on June 30th; that the money he advanced went into the business to his knowledge; that when he, Lewis, took the note for $1100.00, mentioned above, he did not ask Dinkelspeel for any money or mortgage.

The business seems to have lost money from its inception, ran only a few months and evidently was closed by Dinkelspeel declining to continue it early in October, 1934.

It is urged for appellant that this evidence establishes that no partnership ever existed between Lewis and Dinkelspeel, as against the district court's finding to the contrary.

Section 81-201 W. R. S., 1931, defines a partnership as, "an association of two or more persons to carry on as co-owners a business for profit." Paragraph (4) of Section 81-202 W. R. S., 1931, supplying the rules for determining the existence of a partnership, with its subdivisions (a) and (d) reads:

"(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

"(a) As a debt by installments or otherwise, * * *

"(d) As an interest on a loan, though the amount of payment vary with the profits of the business."

Lord Cranworth in the leading English case of Cox v. Hickman, 8 H. L. Cas. 268, 306, indicates very clearly his views of what should be the test of whether a partnership exists or not. He there said:

"It is often said that the test, or one of the tests, whether a person not ostensibly a partner, is nevertheless, in contemplation of law, a partner, is, whether he is entitled to participate in the profits. This, no doubt, is, in general, a sufficiently accurate test; for a' right to participate in profits affords cogent, often conclusive evidence, that the trade in which the profits have been made, was carried on in part for or on behalf of the person setting up such a claim. But the real ground of the liability is, that the trade has been carried on by persons acting on his behalf. When that is the case, he is liable to the trade obligations, and entitled to its profits, or to a share of them. It is not strictly correct to say that his right to share in the profits makes him liable to the debts of the trade. The correct mode of stating the proposition is to say that the same thing which entitles him to the one makes him liable to the other, namely, the fact that the trade has been carried on on his behalf, i. e., that he stood in the relation of principal towards the persons acting ostensibly as the traders, by whom the liabilities have been incurred, and under whose management the profits have been made."

This statement receives from Judge Cooley in Beecher v. Bush, 45 Mich. 188, 196, 7 N. W. 785, his unqualified approval thus: "There is something understandable by the common mind in this test; there is nothing artificial or arbitrary about it; it falls in with reason and enables every man to know when he makes his business

arrangements whether he runs the risk of extraordinary liabilities contracted without his consent or approval."

That great English authority on the law of partnership, Lord Lindley, in the ninth edition of Lindley on Partnership, says, at page 53, that:

"Whether a person advancing money and sharing profits is a creditor or a dormant partner is often a very difficult matter to determine, and can only be decided by a careful study of the whole agreement between the parties to the transaction, and especially by examining what rights are conferred on or taken from the person making the advance. The right of a lender is to be repaid his money with such interest or share of profits as he may have stipulated for; and his right to share of profits involves a right to an account and to see the books of the borrower, unless such right is expressly excluded by agreement. If, however, his advance is risked in the business, or forms part of his capital in it, he ceases to be a mere lender, and becomes in effect a dormant partner, but the fact that he is to have the management of the business does not necessarily make him a partner."

Passing to the law on this matter as expounded in this country, we find that Mr. Justice Gray remarks, in Meehan v. Valentine, 145 U. S. 611, 12 Sup. Ct. 972, 36 L. Ed. 853, that:

"Those persons are partners, who contribute either property or money to carry on a joint business for their common benefit, and who own and share the profits thereof in certain proportions. If they do this, the incidents or consequences follow, that the acts of one in conducting the partnership business are the acts of all; that each is agent for the firm and for the other partners; that each receives part of the profits as profits, and takes part of the fund to which the creditors of the partnership have a right to look for the payment of their debts; that all are liable as partners upon contracts made by any of them with third persons within the scope of the partnership business; and that even an express stipulation between them

that one shall not be so liable, though good between themselves, is ineffectual as against third persons. And participating in profits is presumptive, but not conclusive, evidence of partnership."

20 R. C. L. 834, discussing the tests of partnership in special cases, states that: "Not infrequently two or more persons unite in business, one contributing money and the other labor, the profits being divided between them, and in such cases it is usually held that a partnership is formed." This text, at page 838, indicates the American rule as to loans, saying that it has been held many times "that an agreement to lend money to a person engaged in business in consideration of a certain percentage of the net profits of that business does not constitute the parties partners as between themselves or as to third persons." The transaction, however, cannot be a mere device to avoid the liability of a partner. "The distinction," the cited text continues, "which is drawn is between lending money to the proprietor of a business and contributing money and investing it as capital in the business. If the party investing the money is to be repaid out of the profits as profits and the amount is to depend on the business, so that it will fluctuate according to the amount of the net whole profits, there is such a community as to the profits as will create a partnership." And on the subject of the liabilities of dormant partners (page 1072), after defining a "dormant partner" as "one whose connection with the partnership business is concealed and who does not take any active part in it. Both secrecy and inactivity are implied by the word. Yet to be a dormant partner it is not necessary that a person should wholly abstain from any actual participation in the business of the firm, or be universally unknown as having a connection with it," the same text further says:

"Dormant partners have the same general powers

as ordinary partners and have the same right to act for the firm in partnership transactions in the absence of stipulations to the contrary. A dormant partner who participates in profits may in like manner be held subject to the normal liabilities of partners, however secret he may keep his relation, because the law will not allow a dormant partner secretly to share in the profits of the firm without taking his share of the risks and bearing his share of the losses as to third persons. And this rule holds true in a case where the dormant partner was not known as a member of the firm at the time of the creation of the debt, and in spite of any agreement entered into between the parties purporting to limit the liability of the dormant partner. It is not to be presumed that credit was given on the sole and separate responsibility of the ostensible partner so as to allow the dormant partner to escape liability." (Pages 1072-1073.)

Similarly 47 C. J. 900 declares that:

"A dormant partner is liable, not because credit is supposed to have been given to the partnership by reason of his connection with it, but because he is one of the contracting parties and participates in the profits thereof, and also partly on the ground of public policy.

"Undisclosed or dormant partners, when discovered, may be held liable for property or goods purchased by one partner for the use of the firm and used by it, although the acting partner gives his individual note therefor."

The principle relative to loans already referred to in the volume of Ruling Case Law above cited is well established, as indicated in our state statute quoted above, and as somewhat more elaborately phrased in 47 C. J. 703-704:

"One who merely makes a loan of money or credit to the owner of a business in consideration of a share of its profits in repayment of such loan or advance, or in lieu of, or in addition to, interest for its use, does not thereby become liable to third persons as a partner in the business."

It is frequently difficult, of course, to ascertain just whether a person thus advancing money or sharing profits shall be regarded as a creditor or as a partner in the firm, because the advancement of money may, and ordinarily does, represent a partner's contribution to the firm capital. So the text last cited further says:

"To constitute a loan the money advanced must be returnable in any event, and if it is so repayable and constitutes a personal debt there is no partnership. It is not a loan if repayment is contingent upon the profits, for in such a case it is made not upon the personal responsibility of the borrower, but upon the security of the business; and where the money is so risked in the business, it strongly tends to show that the contract was one of partnership, and not a mere loan."

The author of the exhaustive note in 18 L. R. A. (N. S.) 1047, states the law to be thus:

"It is universally admitted that a person who actually invests capital in a business for expected profits becomes a partner in such business; but it is exceedingly difficult to determine in any given case whether there was an actual investment of capital, or a mere loan of money to the proprietor of the business. The net-profit rule was considered to afford an unfailing test so long as it was regarded as conclusive proof of the partnership relation; but, when exceptions to the rule in favor of agents, servants, and persons furnishing property who share profits were established, it was at once perceived that a logical distinction between furnishing property and furnishing money did not exist, and another exception was grafted upon the rule.

"It will be found, therefore, that whenever a person who contributed money to a trade or business for a share of its profits in return has been held liable to its creditors as a partner, in the absence of any element of estoppel, since the exceptions mentioned were established, it has been because the court so deciding was of the opinion that he had really invested capital in the business, and not simply lent money to its proprietor."

398

In Buford v. Lewis, 87 Ark. 412, 112 S. W. 963, Buford owned a sawmill which he sold to one Strong, reserving a lien to himself to secure the purchase money. Strong at first sold a half interest to Carroll, and thereafter the latter purchased Strong's remaining interest. Carroll ultimately gave Buford a note, secured by mortgage on the property, when Strong sold out his interest. Buford sued Carroll to foreclose the mortgage and subsequently joined Lewis, seeking to hold him liable as a partner jointly with Carroll. The decisive question in the case was whether a partnership existed between Carroll and Lewis. Lewis' testimony briefly was that he was to furnish Carroll the money to buy into and operate the mill property and for the use of that money he was to receive half the profits; that Carroll was to manage the mill business in his own name and Lewis was not to be known in it so far as being responsible for anything was concerned; that Lewis was simply to furnish Carroll a certain amount of money to operate the mill, and did so; that Lewis took no note from Carroll for the money advanced; that he, Lewis, was not a partner in the business because he was not responsible for debts Carroll might make; that this was because Lewis did not want to become responsible for Carroll's accounts and acts, but wanted his profits as interest on his investment; and that Lewis went to the mill twice to see how the business was progressing. Carroll testified that Lewis practically bought an interest in the mill, but that they were partners only in the profits. The chancellor at the trial held that no partnership existed. His judgment was reversed on review, the appellate court using this language:

"To determine whether a given agreement amounts to a partnership between the parties themselves is always a question of intention. But a different test prevails where the rights of third parties are concerned.

It was formerly held that participation in profits was conclusive evidence of partnership in actions by creditors. That rule has been modified so that a participation in profits is not conclusive, but 'it is a cogent test for trying the question,' and 'is conclusive unless there are some circumstances altering the nature of the contract.' Culley v. Edwards, 44 Ark. 423; Johnson v. Rothschilds, 63 Ark. 518; Rector v. Robins, 74 Ark. 437; Herman Kahn Co. v. Bowden, 80 Ark. 23.

"In Johnson v. Rothschilds, supra, this statement from the Supreme Court of Florida (Dubois v. Jones, 16 So. 392) was approved: 'To constitute a loan in such a case, the money advanced must be returnable in any event. It is not a loan if repayment is contingent upon the profits, for in such case it is made, not upon the personal responsibility of the borrower, but upon the security of the business. Neither must the transaction be a mere device to obtain the benefits of a partnership without incurring the responsibilities, for in such case, whatever else the parties may call it, it will be construed to be a partnership.'

"In this case the advance of $1,000 to Carroll was not a loan, because the money was not returnable in any event; its repayment was contingent upon the profits. The loan was not made upon the personal responsibility of the person to whom it was advanced, but upon the security of the business. No note was taken from Carroll to Lewis, but a device was contrived by which Strong gave a mortgage upon the entire property, at the same time conveying a half-interest in the property to Carroll, which was in turn assigned to Lewis. This mortgage was evidently to secure to Lewis a preference over possible creditors of the new concern, for it was not pretended anywhere that Strong owed him $1,000, for which the mortgage was executed. The only thousand dollar transaction between them was the purchase of a one-half interest in the business for Carroll, or Carroll and Lewis, as the case may be."

In Kelley Island Lime & Transport Company v. Masterson, 100 Texas 38, 93 S. W. 427, it was held that:

"If one person advances funds, and another fur-

nishes his personal services and skill in carrying on the business and is to share in the profits, it amounts to a partnership. It would be a valid partnership, notwithstanding the whole capital was in the first instance advanced by one partner, if the other contributed his time and skill to the business, and although his proportion of gain and loss was to be very unequal. It is sufficient that his interest in the profits be not intended as a mere substitute for a commission, or in lieu of brokerage, and that he be received into the association as a merchant and not an agent."

The case of Purvis v. Butler, 87 Mich. 248, 49 N. W. 564, lays down the doctrine that parties who have advanced money for the prosecution of a business and agreed to make further advances, and to receive interest on the indebtedness thus created, and also to receive and apply the shared profits in its liquidation, succeeded to a proprietorship of the business and were liable as partners to third persons upon contracts entered into in carrying it on. The court pointed out that:

"Here was a community of interests, an enterprise in which the secured indebtedness of the second and third parties and the labor and business of the first party were embarked as capital, and the profits arising were to be shared and applied to a definite purpose. Their liability does not depend upon their intention to assume the obligation. As to third persons, individuals are often held liable as partners when, as between themselves, it is expressly agreed that they shall not be regarded or held as such. Moore v. Davis, 11 Ch. Div. 261; Van Kuren v. Manufacturing Co., 13 N. J. Eq. 302; Beecher v. Bush, 45 Mich. 188."

Where Roat advanced a sum of money to one Mear, a traveling showman, upon an agreement that after the payment of all expenses Roat was to receive back the sum aforesaid and have one-half of the net profits, in Haas v. Roat, 26 Hun (N. Y.) 632, it was held that Roat and Mear were partners as to third persons, regardless of any agreement to the contrary between themselves.

In Spaulding v. Stubbings, 86 Wis. 255, 56 N. W. 469, these in brief were the facts: O'Connor and Stubbings entered into a contract, wherein it was recited that the former was engaged in carrying on a general merchandise business and that the latter had theretofore loaned him a certain sum, which was evidenced by a note. The contract provided that Stubbings should allow said sum to remain with O'Connor for five years; that O'Connor should pay him interest at the highest legal rate on this amount and also one-half of the net profits of the business, correct books to be kept open at all times to Stubbings' inspection; that the stock of goods in said business should not be sold in bulk during the five years without both parties' consent. Stubbings made further advances for the benefit of the business and was to some extent active in its management, but it was carried on in the name of O'Connor, and in letters to him Stubbings referred to it as "your business." Stubbings desired that his connection with the enterprise should be kept secret. The action was by Spaulding against Stubbings for supplies sold to O'Connor for use in the business. Affirming a judgment holding Stubbings liable as a partner of O'Connor, the court analyzes the evidence thus:

"Moreover, the letters of Stubbings in evidence show that the proposition to start the business at Eagle River was first made by him; that he purchased much stock for the store; that he advised, if he did not dictate, of whom O'Connor should make purchases, as well as prices and terms; that he arranged for credits; and that he carefully watched and freely interfered with all the details of the business, so far as he could obtain knowledge of those details by persistent requests to the O'Connors to furnish him detailed information thereof. In short, he exercised an influence in, and assumed a control over, the management of the business (which was acquiesced in by the O'Connors) entirely incompatible with the idea that he was merely a creditor of O'Connor for the amount of his

advances and interest thereon, which can only be satisfactorily accounted for on the theory that he was handling and directing his own business."

The facts and law deemed by the court applicable thereto in The Southern Fertilizer Company v. Reams, 105 N. C. 283, 11 S. E. 467, appear from this excerpt from the opinion filed thus:

"In our case, the usual elements of partnership are present. Morehead advances the capital, and Reams is to contribute the services to the joint undertaking, which is the purchase and sale of tobacco. No personal liability is contracted by Reams for the money advanced, and the said capital is to be paid out of the partnership stock, and the balance, after the payment of expenses, etc., is to be equally divided as profits between the parties. This, in our opinion, constitutes a partnership, for Morehead, under this agreement, has a proprietary interest both in the stock and the profits.

"That such a transaction is not a loan is settled, we think, by high authority. We extract the following from 1 Bates' Partnership, 49, which is well sustained by many decided cases: 'What is a loan? The fact, however, that the interest expected or received is disproportionate, and the contract usurious, will not affect its construction. To constitute a loan, the money advanced must be returned, in any event, independently of the success or non-success of the business or the making of profits. If the repayment is contingent upon the profits, it is not a loan, for it is then made, not upon the personal responsibility of the borrower, but upon the security of the business.'

"A glance at the agreement plainly shows that the foregoing principles govern our case and are decisive against the plaintiffs' position that Morehead was only a creditor of Reams. Here, the payment, both of the capital and the compensation, was entirely dependent upon the success of the business."

In Orr, Jackson & Co. v. Perry, 16 Ala. App. 658, 81 So. 150, it was held that an agreement whereby a stock of merchandise purchased by one party was to be sold by another party, the latter to participate in

the profits after the repayment of the money originally invested, was, as to third parties, a co-partnership in the business of selling said stock, despite the fact that the one who did the selling had no interest in the capital invested.

The case of Runo v. Rothschild, 219 Mich. 560, 189 N. W. 183, arose under the uniform partnership act, which, as cited above prevails in this state. There a physician and his assistant entered into an agreement whereby the latter undertook to take charge of his offices and equipment and carry on the business for their joint benefit, pay all expenses out of the income and divide the profits. This was held to change the relation of employee and employer into that of a partnership under the act aforesaid. Said the court:

"Plaintiff's affidavit shows an agreement under which defendant was to take charge of his offices and equipment and carry on the business for their joint benefit, pay all expenses out of the income, and divide the profits with him. This severed their previous relations under which defendant was but an employee and constituted the parties copartners.

"Defendant had a right to manage and control the business, and his share of the profits was not in the nature of compensation for services rendered to plaintiff. Plaintiff did not hire defendant to carry on his practice, but entered into relations with him wholly inconsistent with those of master and servant or employer and employe. Defendant was empowered to act for both in the management of the business, and both were liable for the expenses if the income was not sufficient to pay the same. This was not a mere joint adventure, but a community of interests with all the essential incidents of partnership rights and liabilities. The agreement delegated to defendant the power and authority to manage and control the same for their common benefit and profit. Plaintiff contributed toward the earning of profits, in the practice to be conducted by defendant, his offices, laboratory and equipment, and his clientele, and defendant contributed his

time, labor and skill, and such new business as he could command, and these contributions were dedicated to the enterprise for the profits to be derived therefrom.

"While the law has always considered the partnership relation one of contract and intention, it makes determination of the status of the parties from their agreement, and draws their intention from their acts."

Many additional authorities to the same effect as those above reviewed could very easily be supplied.

Applying the principles announced by the foregoing authorities to the evidence in the case at bar, as we have outlined it above, we cannot say that the district court was wrong in its conclusion that Dinkelspeel and Lewis were partners. Lewis really started the business venture himself; he put his own money into it as capital risked in the business and was to share in its profits, if we are to take Dinkelspeel's testimony at its face value, as the district court evidently did. True Lewis denies that the agreement was so, but the rule governing the attitude of this court on conflicting testimony is so well known it is quite unnecessary to repeat it here.

While it is likewise true that a note was after a time given to Lewis by Dinkelspeel, yet there appears to have been no agreement before the business was commenced that such a note was to be forthcoming; it was signed "The Buffet, Joe Dinkelspeel," and unquestionably all the money it represented had theretofore been put into the business. Dinkelspeel says in his testimony that he received individually at that time not a cent, but that he gave the note solely to raise money for the business; Lewis insists that it evidenced a loan only. Here again we have conflicting testimony. Dinkelspeel and his wife, who worked in the place without wages, received nothing from the enterprise except their board and $20.00, which Dinkelspeel says was the only money he personally received during the en-

tire operation of the business. It is quite apparent that both Lewis and Dinkelspeel engaged in the purchase of equipment, sometimes together, sometimes alone, which was used and employed in the business. Lewis inspected the account book of the enterprise, undertook at one time to balance it, and seems to have aided and consulted relative to the conduct of the business in various ways. No written lease was exacted of Dinkelspeel apparently, although Lewis concedes it was his practice before and after this business commenced in June, 1934, and ended in October following, to require such a lease of the premises. It seems to us, scrutinizing the entire record in the case, the trial court had reasonably substantial evidence before it which would enable it to reach the conclusion that Lewis had acted in a fashion entirely inconsistent with the idea that he was merely a creditor and that, as a matter of fact, he was treating and dealing with the business as a proprietor. Reaching the conclusion that the parties were partners, under settled principles of the law of partnership unnecessary to state here, the district court was obliged to find in favor of the plaintiff.

The judgment in Case No. 1962 will therefore be affirmed.

## II.

The review proceedings pending in this court and assigned number 1961, were commenced October 17, 1934, by an action instituted by Joe Dinkelspeel as plaintiff against Hank M. Lewis as defendant, in the district court of Uinta County. Plaintiff's petition contained two causes of action, the first thereof setting out that he had given the defendant the promissory note already described in the foregoing review of the evidence in Case No. 1962 and which was introduced on the consolidated trials of the several actions;

that this note was given "for the purpose and sole and only purpose to enable said defendant to procure finance thereon for the conduct of the business of plaintiff and defendant as co-partners under the firm name and style of The Buffet"; that the plaintiff was led to execute said note by the alleged fraudulent representations of the defendant made to deceive him and to induce him to continue the said co-partnership with said defendant, that if he would execute and deliver to defendant said note the defendant "could and would obtain finance for the business of said plaintiff and defendant as co-partners in said premises in a certain restaurant and bar business under the said firm name and style of The Buffet, by using the said note as collateral to obtain a loan for such purpose"; that relying on said representations and believing them to be true, the plaintiff gave defendant said note; that the defendant at the time he made them knew these representations were false; and that when plaintiff demanded the return of said note it was denied him. Plaintiff prayed that the defendant be restrained from negotiating the instrument, that it be cancelled, and for a sum in damages.

The second cause of action in said petition is based upon similar alleged fraudulent representations relative to the chattel mortgage mentioned in the foregoing opinion relative to Case No. 1962, as given by Dinkelspeel to Lewis on September 14, 1934, and relief of like character with that sought in the first cause of action was also prayed.

The defendant filed an answer in substance admitting the execution of the note and chattel mortgage aforesaid, alleging that "plaintiff delivered said note at the date thereof for value received in former cash advances made by the defendant at the request of the plaintiff in excess of the amount of said note and that at the time thereof plaintiff paid defendant such ex-

cess," that the chattel mortgage mentioned was given to secure said note, and denying generally the other allegations in said petition. The defendant, by counterclaim, sought recovery against the plaintiff on said note, and, in connection therewith, the foreclosure of the chattel mortgage. Plaintiff's reply put in issue the new matter appearing in the defendant's answer.

As heretofore stated, this case was tried with the action hereinbefore reviewed and no separate introduction of evidence was had. The district court found the issues for the defendant in this action (No. 1961), except that the chattel mortgage, whose foreclosure was asked by the defendant's counterclaim, was found by the court to be "executed at a date subsequent to the execution of the note sued upon in said counterclaim and without any additional consideration at the time of its execution and by reason thereof is without any consideration and should be canceled." Judgment was accordingly given against Dinkelspeel in favor of Lewis for the amount due on the note, and the chattel mortgage was declared void.

The attack made by the assigned errors of appellant Lewis is only on the special finding of the court recited above and that part of the judgment rendered pursuant thereto.

The rights of third parties are not involved in this action, and, supported by an extended list of cited cases, 11 C. J. 451 states, as we conceive the rule to be, that: "A preexisting debt is, as between the parties, a sufficient consideration for a chattel mortgage given to secure it."

The trial court appears to have regarded the note as a voluntary settlement of the rights of the parties as partners as between themselves. There is evidence to support this view.

This court in Johnson v. Abbott, 25 Wyo. 133, 165

Pac. 991, has heretofore said: "That a debtor may prefer one creditor to another, although the preferred creditor is his wife, we entertain no doubt, if the purpose is to pay or secure a bona fide claim." To the same effect is Quealy Land & Live Stock Co. v. George, 36 Wyo. 268, 254 Pac. 130.

The district court was mistaken in cancelling the mortgage upon the ground assigned after having upheld the note, and its judgment will in that particular be reversed with instructions to enter a decree foreclosing the mortgage as prayed as against Dinkelspeel.

*Reversed in part with instructions.*

KIMBALL, Ch. J., and BLUME, J., concur.

### ON PETITION FOR REHEARING

The petition for a rehearing filed by the defendant Lewis reargues at length the effect to be given the evidence in these cases. We gave full consideration to this matter before the original opinions filed herein were prepared. Our conclusion was that there was substantial evidence to support the finding of the trial court that a partnership existed between Lewis and Dinkelspeel, and a resurvey of the record in the light of what is now submitted in behalf of a rehearing does not lead us to a different result.

Our attention is now directed by the petition aforesaid to certain cases which deal with the right of one partner in a partnership composed of two members only, to restrict his liability for goods purchased by the other partner by giving express notice to the vendor and to his co-partner that he will not be bound in any way for the price of the goods thus obtained. See Dawson, Blackmore & Company v. Elrod, 105 Ky. 624, 49 S. W. 465, 88 A. S. R. 320; Leavitt v. Peck, 3 Conn. 125, 8 Am. Dec. 157; Monroe v. Connor, 15 Me. 178, 32 Am. Dec. 148. Aside from not being applicable

because the facts in those cases were widely variant from those at bar, it would seem that by relying on decisions of this character the defendant Lewis has undertaken to shift his ground. Heretofore he has strenuously asserted that no partnership existed between him and Dinkelspeel. He now appears to argue that as a partner he had the right to, and did, restrict Dinkelspeel's authority to purchase certain of the merchandise, recovery for which was sought by the plaintiff, Intermountain Association of Credit Men.

But, as heretofore intimated, the evidence in these cases, as we understand it, is sufficient to authorize the trier of fact to decide with reasonable support that Lewis did not unequivocally undertake to restrict Dinkelspeel's authority to make purchases of merchandise upon which he, Lewis, would be bound within the implied scope of the business in which they were engaged, i. e., the bar and restaurant business.

In I Bates on Partnership, Section 325, the author says:

"A partner may, within certain limits, revoke or restrict a copartner's power as to future or executory contracts, or can dissent from a particular contract, and, by notice to the nonpartner, can relieve himself from liability as to it, if made in disregard of such dissent. It may be suggested, however, that such dissent is only possible of the implied powers of a partner, and not of those given by express contract in the articles, as to which the only revocation is by dissolution.

"The intention thus to interfere must be clear and beyond reasonable doubt."

And in Leavitt v. Peck, supra, the court states: "The plaintiff must have knowledge of the precise consequences to which the refusal would extend."

Now, as pointed out in the original opinion, with reference to the refrigerators purchased from the

Utah Power & Light Company, the manager of that corporation testified that these were purchased by *both* Lewis and Dinkelspeel, i. e., they both took part in negotiating the contract of sale. It is true the same witness says that Lewis told him to charge the articles to Dinkelspeel, but he also testifies that he was not told by Lewis that he was not in any way responsible for Dinkelspeel's bills. We find substantially the same situation outlined in the testimony of the president of the Western Furniture Company relative to the item of $96.46, for merchandise furnished subsequent to the original purchase of property for use in the business. For example, on cross-examination, that official, to the question, "And Mr. Lewis told you then (July 1934) that he would not be liable for any more?" responded, "No. At that time he stated that in case the place bought anything more, or was ordered, not to hold him personally for it." Whereupon counsel additionally interrogated, "To hold Joe Dinkelspeel for it?" and the witness answered, "No, not to charge it in his name personally. Joe was right there." When we recall that Dinkelspeel's testimony was to the effect that Lewis did not wish to be known as interested in the business after it started, the evidence above referred to would seem merely to evince an intention on Lewis' part to have the bills charged to Dinkelspeel as the active manager of the business, but not to disclaim unequivocally any liability whatsoever therefor. None of the cases cited by Lewis disclose a situation where both the partners engaged in the purchase of merchandise and then, on the ground that one of them had notified the vendor not to charge the account to him personally, the partner thus acting undertook to disclaim all liability whatsoever for the goods purchased, and was upheld by the court in so doing. We did not undertake to set forth in the original opinions, and shall not now, any exhaustive review of the evidence

which tended to support the conclusion reached by the trial court. To do so would have unreasonably lengthened the opinions.

It is intimated that the purchase of the refrigerators aforesaid was not within the scope of the partnership business. Inasmuch as the purpose of the firm was to carry on a restaurant and bar business, we quite fail to perceive that there is any room for such a contention, it being common knowledge that such devices are constantly used in business enterprises of this character for preserving and cooling supplies of food and drink.

The note and mortgage involved in Case No. 1961 were given voluntarily by Dinkelspeel to Lewis, as appears by Dinkelspeel's testimony, with the idea of protecting Lewis against Dinkelspeel's personal creditors, and thereby preventing, as far as possible, a loss to Lewis on account of his investment of funds in the business. In other words, it really defined and settled the rights of the partners as between themselves. Dinkelspeel, among other things, says in his testimony, "After he (Lewis) furnished the money, I certainly ought to furnish the note."

The recent case of Washakie Livestock Loan Company v. Meigh, 50 Wyo. 480, 62 Pac. (2d) 523, is cited as indicating that no weight whatever should have been attached to the testimony of Dinkelspeel. It is said that his testimony is of similar character, so far as contradictions are concerned, with that of Meigh in the case last mentioned. We think counsel is mistaken. He directs our attention to the fact that through cards, advertising, etc., put out by him, the business was carried on in the name of Joe Dinkelspeel. However, the latter's testimony was repeatedly to the effect that this was done solely at the instance of Lewis, because he desired to be unknown as a partner in the business. In the Washakie Livestock Loan Company

412

case, supra, Meigh's testimony and his sworn statement to obtain the loan he sought were diametrically opposed to each other. No explanation of the situation was attempted, even if one could have been supplied. The case is not in point.

We are convinced that with the alteration of the judgment in Case No. 1961, as directed in the original opinion, a result has been obtained in both cases consonant not only with the legal principles which should properly govern them, but with the equitable rights and duties of all parties to this litigation. A rehearing will be denied.

*Rehearing denied.*

BLUME, Ch. J., and KIMBALL, J., concur.